**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | |
|     Plaintiff, | ) | 1:10-cv-7852 |
| | ) | |
|     v. | ) | |
| | ) | Judge Darrah |
| WEST ASSET MANAGEMENT, INC., | ) | |
|     Defendant. | ) | |
| | ) | JURY DEMANDED |
| | ) | |

**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACT**

1.      **West Asset Management, Inc. is a debt collection agency that has no relationship with plaintiff.**

Exhibit A, Answer at ¶¶ 3, 6.

2.      **Plaintiff is an individual who resides in Chicago, Illinois, and his cellular telephone number is 773-xxx-7272.**

Exhibit B Pl. Resp. West Discovery at Interrogatory 1.

3.      **West called plaintiff's 7272 cellular telephone twenty-five times within four years of the filing of this complaint.**

Exhibit C, West Responses to Plaintiff's Discovery at Interrogatory 1.

4.      **Each of the twenty-five calls were dialed by West's Ontario Systems, Guaranteed Contacts ("GC") dialer.**

Exhibit C at Int. 1; Exhibit D, Deposition of Jill A. Jensen, senior vice president of the

performance enhancement group at West Asset  management, given in this case

("Jensen Depo"), at 7:15-17, 26:23-25.

**5.     The GC dialer is capable of dialing telephone numbers without human intervention, and each of the twenty-five calls to plaintiff was *dialed* by the GC Dialer, and not by a human being.**

Exhibit D, Jensen Depo. at 9:6-10, Exhibit C at Int. 1.

6.     **West left one recorded message for plaintiff on his cellular telephone, each within four years of the filing of this complaint.**

Exhibit C, West Responses to Plaintiff's Discovery at Interrogatory 1, at August 17, 2010, 8:50 pm entry.

**7.     This message was recorded ahead of time, and played automatically when West's Guaranteed Contacts dialer believed someone or something had answered plaintiff's phone.**

Exhibit D, Jensen Depo at 10:7-9, 15:1-8, 17:3-6.

8.     **Whenever West uses its dialers and recorded messages, it intends to make such calls, and the calls to the 7272 number were intentional, too.**

See Exhibit D, Jensen Depo, generally, showing that West owns and uses two predictive dialers that leave recorded messages, that were designed for efficiency.  E.g. 28:6-15.

9.     **West is not aware of any evidence that might suggest that Domingonho Powell provided "prior express consent" to be called on his cell phone, 773-xxx-7272.**

Exhibit A at ¶ 2.

10.    **This Court has federal question subject matter jurisdiction because this case is brought pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227 et seq., which us a federal law.  28 U.S.C. §1331.**  Exhibit A, Answer at ¶ 1.

11. **Venue is proper because plaintiff resides in this District, and received defendant's illegal calls while within this District.** <u>Exhibit B</u> at Interrogatory 1.

Respectfully submitted,

<u>/s/Alexander H. Burke</u>

**BURKE LAW OFFICES, LLC**
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOMINGINHO POWELL,         )
                                   )
        Plaintiff,           )     Judge Darrah
                                   )
    - vs-                  )     Case No.:     10 CV 7852
                                   )
WEST ASSET MANAGEMENT, INC., )     Magistrate Judge Schenkier
                                   )
        Defendant.       )

## <u>WEST'S ANSWER AND AFFIRMATIVE DEFENSES</u>

NOW COMES defendant West Asset Management, Inc. (West) by and through undersigned counsel, and for its answer to plaintiff's complaint, states as follows:

1.     Plaintiff Dominginho Powell brings this action to secure redress for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA").

**Answer:**    **West admits that plaintiff purports to bring claims under the FDCPA and TCPA, but denies any violations, wrongdoing or liability under the law and denies the allegations of ¶ 1.**

2.     The defendant debt collection agency West Asset Management, Inc. ("West" or "defendant") called plaintiff upwards of 25 times using an automatic voice dialing system and prerecorded voice message, sometimes multiple timers per day. Powell has no relationship with West.

**Answer:** **West admits, upon information and belief, that it has no relationship with plaintiff. Except as specifically admitted, West denies the allegations of ¶ 2.**

3.     This Court has federal question subject matter jurisdiction over the TCPA claims under 28 U.S.C. §§ 1331, 1337, and 15 U.S.C.§ 1692k.

**Answer:** **West admits the allegations of ¶ 3 for jurisdictional purposes only.**

4.     Venue is proper because a substantial portion of the events complained of occurred in this District.

**Answer:** **West admits the allegations of ¶ 4 for venue purposes only.**

5.     Plaintiff is an individual who resides in this district.

**Answer:** **West is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 5, which has the effect of a denial.**

6.     West Asset Management, Inc. is a debt collection agency that does business in this District.  Its registered agent is Illinois Corporation Service, 801 Adlai Stevenson Dr., Springfield, IL. Its headquarters are in Marietta, Georgia.

**Answer:** **West admits the allegations of ¶ 6.**

7.     The TCPA prohibits the use of "automatic telephone dialing systems" to call cellular telephones.  The Federal Communications Commission ("FCC") has held that any telephone system that has "the capacity to dial numbers without human intervention" falls within the prohibition in 47 U.S.C. § 227(b). *In re Rules and Regulations Implementing the TCPA,* GC Docket 02-279, ¶ 13 (January 4, 2008).

**Answer:** **Paragraph 7 contains no allegations directed at West and is a conclusion of law to which no answer is otherwise required. To the extent any allegations are stated against West, to the extent that plaintiff's allegations misstate the law, or to the extent an answer is required, West denies the allegations of ¶ 7.**

8. For purposes of this complaint, the term "dialer" refers to a system that has the capacity to dial numbers without human intervention. In other words, the Dialer, rather than a human being, dials the telephone numbers.

**Answer:** **West admits the allegations of ¶ 8 for purposes of plaintiff's complaint only.**

9. One of West's Dialers is a system called "Guaranteed Contacts".

**Answer:** **West admits only that it uses a Guaranteed Contacts dialer.**

10. Upon information and belief, most of the telephone calls made through West's Guaranteed Contacts Dialers are made as part of a dialing campaign. This means that a representative of West selects a group of persons or accounts to call based upon certain criteria.

**Answer:** **West admits only that the Guaranteed Contacts dialer is used on certain dialing campaigns in which accounts to be called are identified and called. Except as specifically admitted, West denies the allegations of ¶ 10.**

11. The Dialer(s) then intelligently decide when a debt collection call will likely be effective to collect a debt for a particular debtor/number (for example, when the debtor is likely near her telephone), and dials the telephone numbers according to this determination.

**Answer:** **West denies the allegations of ¶ 11.**

12.     When someone answers a call made during a campaign, either the call is forwarded to an operator (likely to happen if there is an operator available), or a prerecorded message is played.

**Answer:** **West admits that during certain campaigns, an answered call can be transferred to an operator or a message might be played.  Except as specifically admitted, West denies the allegations of ¶ 12.**

13.     West called plaintiff's cell phone number ending in 7272 at least twenty five times in 2010, using its Dialer.

**Answer:** **West admits only that it called a telephone number ending in 7272 approximately 25 times.  Except as specifically admitted, West denies the allegations of ¶ 13.**

14.     Plaintiff has no relationship with West.

**Answer:** **West admits the allegations of ¶ 14 upon information and belief.**

15.     Upon information and belief, West was attempting to collect a debt alleged owed by a person named Charmaine Hunter, to AT&T, account number ending in 5555.  Plaintiff has never had any relationship with AT&T with respect to any account with the number ending in 5555.

**Answer:** **West admits that it was attempting to collect a debt owed by Charmaine Hunter to AT&T on an account ending in 5555.  Except as specifically admitted, West is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of ¶ 15, which has the effect of a denial.**

16.     At no time did West have plaintiff's prior express consent to call plaintiff on his cell phone using an automatic telephone dialing system or prerecorded voice message.

**Answer:     West is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 16, which has the effect of a denial.**

17.     West cannot show that it had plaintiff's consent to call the 7272 phone number, which is plaintiff's cell phone.

**Answer:     West is without sufficient knowledge or information to form a belief as to the truth of the allegations of ¶ 17, which has the effect of a denial.**

18.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/12/10 at 5:48 pm.

**Answer:     West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged.  Except as specifically admitted, West denies the allegations of ¶ 18.**

19.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/14/10 at 12:29 pm.

**Answer:     West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged.  Except as specifically admitted, West denies the allegations of ¶ 19.**

20.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/14/10 at 3:30 pm.

**Answer: West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 20.**

21.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/16/10 at 9:11.

**Answer: West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 21.**

22.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/16/10 at 12:12 pm.

**Answer: West admits that its records reflect that it placed a call to number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 22.**

23.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/16/10 at 3:34 pm.

**Answer: West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 23.**

24.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/16/10 at 3:34 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 24.**

25.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 07/24/10 at 9:56.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 25.**

26.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/03/10 at 12:18 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 26.**

27.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/03/10 at 7:33 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 27.**

28.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/09/10 at 11:58.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 28.**

29.    West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/11/10 at 2:38 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 29.**

30.    West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/17/10 at 11:05 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 30.**

31.    West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/17/10 at 8:50 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 31.**

32.    West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/21/10 at 10:19.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 32.

33. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/23/10 at 5:16 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 33.

34. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/23/10 at 8:23 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 34.

35. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/25/10 at 12:50 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 35.

36. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 08/27/10 at 11:19.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 36.

37. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 09/01/10 at 12:21 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 37.

38. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 09/02/10 at 2:05 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 38.

39. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 09/02/10 at 5:07 pm.

**Answer:** West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 39.

40. West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 09/04/10 at 1:35 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 40.**

41.     West called plaintiff at the 7272 phone number using its Guaranteed Contacts Dialer on 09/07/10 at 8:50 pm.

**Answer:** **West admits that its records reflect that it placed a call to a number ending in 7272 through its dialer at the date and time alleged. Except as specifically admitted, West denies the allegations of ¶ 41.**

42.     Upon information and belief, based upon the fact that West uses or used a "scrub" service to determine whether phone numbers are cell phone numbers, West knew it was calling a cellular telephone.

**Answer:** **West denies the allegations of ¶ 42.**

### Count I – TCPA – Strict Liability

43.     Plaintiff incorporates all previous paragraphs.

**Answer:** **West re-alleges and re-avers its Answer to ¶¶ 1-42.**

44.     West violated the TCPA by calling plaintiff on his cell phone using an automatic telephone dialing system and/or prerecorded or automatic voice messages.

**Answer:** **West denies the allegations of ¶ 44.**

45.     Plaintiff seeks statutory damages of $500 per violation.

**Answer:** **West denies the allegations of ¶ 45.**

46.     Additionally, plaintiff seeks treble damages, up to $1,500 per violation.

**Answer:** **West denies the allegations of ¶ 46.**

## COUNT II -- FDCPA

47.     Plaintiff incorporates all previous paragraphs of this complaint.

**Answer:     West re-alleges and re-avers its Answer to ¶¶ 1-46.**

48.     Defendant violated the FDCPA, including 15 U.S.C. § 1692d(5), by calling plaintiff so many times, when defendant should have known that it was calling the wrong person.

**Answer:     West denies the allegations of ¶ 48.**

49.     Further, each violation of the TCPA is a violation of the FDCPA, because making such calls constitutes a statement that the defendant is legally entitled to do something, when it is not.

**Answer:     West denies the allegations of ¶ 49.**

50.     WHEREFORE, plaintiff requests that this Court enter judgment for plaintiff and against defendant for:

      a.     Statutory damages;

      b.     Attorney's fees and costs of suit'

      c.     Any other relief the Court deems fit.

**Answer:     West denies the allegations of ¶ 50, including subparts (a) through (c).**

      AND NOW, in further Answer to the Complaint, Defendant West avers as follows:

## FIRST AFFIRMATIVE DEFENSE

One or more of the Counts contained in the Complaint fail to state a claim against West upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Pursuant to 15 U.S.C. § 1692k(c), to the extent that a violation is established and in the event West is found to be a debt collector as defined in the FDCPA, which is specifically denied, any such violations was not intentional and resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

## THIRD AFFIRMATIVE DEFENSE

Though denying that plaintiff has sustained any damages, to the extent plaintiff can establish that she has sustained any damages, plaintiff has failed to mitigate those damages by either answering one of West's calls, or by returning West's calls to advise West that they were allegedly calling the wrong party.

## FOURTH AFFIRMATIVE DEFENSE

The equipment used by West is not an automatic telephone dialing system as defined by and subject to the TCPA.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff lacks standing under the TCPA because he was not the called party.

WHEREFORE, Defendant West respectfully requests that this answer be deemed good and sufficient, plaintiff's lawsuit be dismissed, with prejudice, at plaintiff's costs, pursuant to Federal and State law, plaintiff be ordered to pay reasonable attorney's fees and costs for West, and for all other general and equitable relief.

Respectfully submitted,

/s/ James K. Schultz
Attorney for Defendant West

James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
E-Mail: jschultz@ sessions-law.biz

Attorney for Defendant West Asset Management, Inc.

**CERTIFICATE OF SERVICE**

I certify that on this 3rd day of January, 2011, a copy of the foregoing Answer and Amended Affirmative Defenses was filed electronically in the ECF system. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system, including plaintiff's counsel as described below. Parties may access this filing through the Court's system.

Alexander H. Burke
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 732
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com


/s/ James K. Schultz
Attorney for Defendant West

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOMINGINHO POWELL,                    )
                                      )
                    Plaintiff,        )
                                      )
-vs-                                  )        Case No. 1:10-cv-7852
                                      )
WEST ASSET MANAGEMENT, INC..          )        Magistrate Judge Schenkier
                                      )
                    Defendant.        )

**POWELL'S RESPONSES TO WEST'S DISCOVERY REQUESTS**

**I. REQUESTS FOR ADMISSION**

1.      Admit that you have cellular phone service for the number 773-███7272.

        **Response**:  Admit.

2.      Admit that 773-███7272 is the number that you allege was being unlawfully
        called by WEST.

        **Response**:  Admit.

3.      Admit that you do not pay for the cellular service you receive at 773-███7272.

        **Response**:  Deny.

4.      Admit that any messages that were left at 773-███7272 by West were left for
        Charmaine Hunter.

        **Response**:  Deny.

5.      Admit that you first received a message on the 773-███7272 number from West
        on or about July 12, 2010.

        **Response**:  Admit

6.     Admit that the message you received on July 12, 2010 from West at 773-███-7272 identified the intended recipient of the call as Charmaine Hunter.

       **Response**:  Plaintiff does not recall the message stating this.  Therefore, deny.

7.     Admit that you never returned the call from West in response to the message of July 12, 2010 to advise West that they had not reached Charmaine Hunter.

       **Response**: Admit.

8.     Admit that after July 12, 2010, you received additional messages from West at 773-███-7272.

       **Response:** Admit.

9.     Admit that none of the messages left by West since July 12, 2010 at 773-███-7272 were for you.

       **Response:**  Deny.  All of the messages left were for plaintiff, on plaintiff's phone.  Admitted that none of these messages mentioned plaintiff's name.

10.    Admit that none of the messages left by West since July 12, 2010 at 773-███-7272 stated they were for you.

       **Response:** Admit.

11.    Admit that all of the messages left by West since July 12, 2010 at 773-███-7272 stated they were for Charmaine Hunter.

       **Response:**  Deny.  Plaintiff recalls that some of the messages mentioned Charmaine Hunter, and some did not.

12.    Admit that you never returned a call from West in response to a message left at 773-███-7272.

       **Response:** Deny.

13.    Admit that you never called West since July 12, 2010 to advise West that the number being called at 773-███-7272 was not associated with Charmaine Hunter.

       **Response:**  Deny.  Counsel informed defense counsel that its client was improperly calling Powell, before filing suit.

2

14.     Admit that you never called West since July 12, 2010 to advise West that the number being called at 773-███ 7272 was not associated with Charmaine Hunter.

**Response:**   Deny.   Counsel informed defense counsel that its client was improperly calling Powell, before filing suit.

15.     Admit that you were not the person that West was calling at 773-███ 7272.

**Response:** Deny.  Plaintiff was the *only* person West was calling at that number.

16.     Admit that West was attempting to reach Charmaine Hunter when it called 773-███ 7272.

**Response:**  Plaintiff cannot answer because this request for admission has to do with West's state of mind.

18.     Admit that you were not the intended recipient of the calls from West.

**Response:**  Plaintiff cannot answer because this request for admission has to do with West's state of mind.

## II. INTERROGATORIES

1.     Identify each and every person who provided any information in connection with answers to these Requests for Admission, Interrogatories and Requests for Production of Documents served contemporaneously with these Interrogatories.

**Response**:  Dominginho Powell, ███████████████████████ Chicago, IL 60613.  773-███ 7272.

2.     Identify Dominginho Powell.

**Response**:  Dominginho Powell, ███████████████████████ Chicago, IL 60613.  773-███ 7272.

3.     Describe in detail each communication and/or conversation that you had with West, including the date, time, and substance of each communication and/or conversation.

**Response**:  Plaintiff called West at least once to find out who was calling him.

4.      Describe in detail each communication, call and/or conversation that anyone made on your behalf to West, including the date, time and substance of each communication, call and/or conversation.

**Response**:  Plaintiff's counsel contacted defense counsel to notify West that it was calling the wrong person.

5.      Identify every person who has knowledge regarding the claims contained in the Complaint and provide a brief description of the substance of his/her knowledge.

**Response**:      Plaintiff and defendant have knowledge regarding the claims in the complaint.  Plaintiff knows about the calls to his cellular telephone, and defendant knows about these calls, too.

6.      Identify each and every witness to any communication that you had with West, giving the date and time of each communication.

**Response**:      Plaintiff thinks that someone was probably present for phone calls; possibly Ashley Walls, but is not certain.  There were a lot of calls, and plaintiff carries his cell phone basically everywhere he goes.

7.      Identify any documents, taped recordings of conversations or recordings of messages that reflect communications or attempted communications between you and West.

**Response**:      Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

8.      Describe your educational background and history, including whether or not you graduated from high school, attended any vocational-technical or trade schools, attended any college or university, including graduate education, and whether you graduated from any college or university and if so your degree and major.

**Response**:  High school diploma.  Vocational training at Illinois School of Health Careers in downtown Chicago.

9.      Identify by name, address and telephone number your current and past employers since either gradating or terminating your education, including dates of employment, position or job title and salary and reason for separation.

**Response**:  Plaintiff objects because employment is not reasonably calculated to lead to discovery of admissible evidence.   is plaintiff's current employer.

10.     Identify all other lawsuits and court proceedings in which you are or were a party, including for each suit the case number, the name of the Court, the style of the case, and the subject matter of the case.

   **Response**:
   Powell v. PLS
   Powell v. Rice Property Management
   Powell v. Torres Credit
   Powell v. Collecto, Inc.

11.     Identify any other collection accounts not described in the Complaint for which you have been contacted by a collection agency or creditor for the past 7 years.

   **Response**:  Plaintiff objects because this information is not reasonably calculated to lead to discoverable evidence.  No such information will be provided.

12.     Describe any criminal record that you have, including whether you have ever been convicted of a crime or have pleaded guilty or *nolo contendere* to a crime, and if so, the date of each conviction or plea, the name of the court, the crime involved, and the prison or jail, if any, where incarcerated.

   **Response:**     None**.**

13.     Identify any notice, whether oral or written, that you provided to West in which you disputed the debt at issue in this lawsuit.

   **Response**:     None.

14.     Identify all experts you may use at trial, specifying the name and address of the expert and the expert's expected testimony.

   **Response**:     Plaintiff objects because the Court has set a schedule for expert witnesses.  Plaintiff does not anticipate using an expert, but does not wish to preclude designating someone, if appropriate.

15.     Describe the factual basis and amounts of all damages you sustained as a result of West's conduct.

   **Response**:     Plaintiff does not claim any actual damages, although the calls were annoying and disrupted his life.  Plaintiff seeks statutory damages of between $500 and $1,500 per call.  Plaintiff also seeks an injunction prohibiting West from calling plaintiff using the proscribed equipment and a declaration that defendant violated the TCPA.

16.     Identify all documents that support your actual damages that you sustained as a result of West's conduct.

   **Response**:  Plaintiff does not claim any actual damages, although the calls were annoying and disrupted his life.

17.     Identify any calendars, diaries, logs, notes, journals, or any other written or recorded summary of events maintained by you that in any way relate to this lawsuit.

   **Response**:  None.

18.     Identify any doctors or medical professionals that treated you or medical treatment that you received related to your acute anxiety, stress and/or heart condition and identify and describe the date(s) and substance of each such visit and/or treatment.

   **Response**:  None.

19.     Identify your home and cellular telephone numbers and the telephone providers for your home and cellular telephone numbers.

   **Response**:  Sprint is the carrier for plaintiff's cell phone.  Plaintiff does not have a home phone.

20.     Identify every telephone number at which you allege West contacted you and state if the number is a home or cellular number.

   **Response**:  Plaintiff is not aware of having been contacted on any phone but his cell phone.

21.     Identify every phone call that you placed to West including the date and time of each call and the phone number from which you called.

   **Response**:  Plaintiff called West in around the summer of 2010, to find out who kept calling his cell phone.

22.     State when you first obtained telephone service at the number you claim was being called by West, the service provider for that service, the telephone number, the identity of all authorized users and the person that had service at that telephone number immediately prior to you.

   **Response**:  Plaintiff is not sure when he first got the Sprint service.  He is trying to determine this date.

6

23.	Identify the name of the person that pays the bill for phone service for the cellular telephone identified in Interrogatory 20.

**Response**:  Plaintiff pays the bill for his phone.  The phone bills are mailed to his mother, Vanessa Powell.  This is a family plan, and plaintiff is an authorized user.

24.	Describe the nature of your relationship, if any, with Charmaine Hunter, including whether you are related to her, by either blood or marriage, know Charmaine Hunter, and for how long you have known Charmaine Hunter.

**Response**:  No relationship.

### III. REQUESTS FOR PRODUCTION OF DOCUMENTS

1.	Produce all documents that support the factual basis and amounts of all damages you claim you have suffered, including but not limited to statutory damages, actual damages, and mental or emotional damages.

**Response**:   Plaintiff seeks statutory damages, only.   The amount of those damages is based upon defendant's conduct, not plaintiff's.  Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

2.	Produce all documents identified in your responses to the Interrogatories.

**Response**:	Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

3.	Produce all documents you referred to or relied on in preparing your interrogatory responses.

**Response**:	Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

4.	Produce all documents that support your factual allegations in the Complaint.

**Response**:	Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

5.	Produce all documents supporting the allegations in ¶ 10 of your Complaint that "Upon information and belief, most of the telephone calls made through West's Guaranteed Contacts Dialers are made as part of a dialing campaign.  This means

that a representative of West selects a group of persons or accounts to call based upon certain criteria."

**Response**:    Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

6.    Produce all documents supporting the allegations in ¶ 11 of your Complaint that "The Dialer(s) then intelligently decide when a debt collection call will likely be effective to collect a debt for a particular debtor/number (for example, when the debtor is likely near her telephone), and dials the telephone numbers according to this determination."

**Response**:    Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

7.    Produce all documents supporting the allegations in ¶ 12 of your Complaint that "When someone answers a call made during a campaign, either the call is forwarded to an operator (likely to happen if there is an operator available), or a prerecorded message is played."

**Response**:    Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

8.    Produce all documents supporting the allegations in ¶ 13 of your Complaint that "West called plaintiff's cell phone number ending in 7272 at least twenty five times in 2010, using its Dialer."

**Response**:    Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

9.    Produce all documents supporting the allegations in ¶ 15 of your Complaint that "Upon information and belief, West was attempting to collect a debt alleged owed by a person named Charmaine Hunter, to AT&T, account number ending in 5555.  Plaintiff has never had any relationship with AT&T with respect to any account with the number ending in 5555."

**Response**:    Plaintiff has attached all responsive documents he has been able to locate.  Investigation continues.

10.    Produce all documents supporting the allegations in ¶ 16 of your Complaint that "At no time did West have plaintiff's prior express consent to call plaintiff on his cell phone using an automatic telephone dialing system or prerecorded voice message."

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Investigation continues.

11. Produce all documents supporting the allegations in ¶ 17 of your Complaint that "West cannot show that it had plaintiff's consent to call the 7272 phone number, which is plaintiff's cell phone."

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Plaintiff also notes that this document request asks plaintiff to produce documents to prove that something never happened. Investigation continues.

12. Produce all documents supporting the allegations in ¶ 42 of your Complaint that "Upon information and belief, based upon the fact that West uses or used a "scrub" service to determine whether phone numbers are cell phone numbers, West knew it was calling a cellular telephone."

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Investigation continues.

13. Produce your telephone and cellular phone records from July 7, 2010 – September 07, 2010.

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Investigation continues.

14. Produce all recordings of any conversations with West or messages from West.

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Investigation continues.

15. Produce a copy, in text or audio form, of the outgoing voice mail message for your cellular telephone since January, 2010.

**Response**: Plaintiff has attached all responsive documents he has been able to locate. Investigation continues.

/s/Alexander H. Burke

**BURKE LAW OFFICES, LLC**

155 N. Michigan Ave., Suite 9020
Chicago, IL 60601

9

(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com


I hereby certify that on this 13th day of May, 2011, a copy of the foregoing

**Responses to West Asset Management Inc.'s Discovery Requests** was served on the

following attorneys of record via electronic mail at the address below.


James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603
Telephone: (312) 578-0990
Facsimile: (312) 578-0991
E-Mail:  jschultz@ sessions-law.biz

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DOMINGINHO POWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge Darrah** |
| **-vs-** | ) | |
| | ) | **Case No.: 1:10-cv-7852** |
| **WEST ASSET MANAGEMENT,** | ) | |
| **INC.,** | ) | **Magistrate Judge Schenkier** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

### WEST ASSET MANAGEMENT INC'S RESPONSES TO
### PLAINTIFF'S FIRST DISCOVERY REQUESTS

NOW COMES defendant West Asset Management, Inc., through undersigned counsel, and pursuant to Federal Rules of Civil Procedure 33, 34 and 36, hereby submits the following responses to Plaintiff's First Discovery Requests.

### REQUESTS FOR ADMISSION

1.      West never had plaintiff's consent to receive autodialed calls at the 7272 phone number.

**RESPONSE:        Objection; this request assumes facts not in evidence and erroneously assumes that the equipment used by West for making telephone calls was an automatic telephone dialing system subject to the TCPA.  Subject to and without waiving this objection, West admits that it currently has no evidence that plaintiff consented to receive autodialed calls at the 7272 phone number, but denies that it did not have consent to call the 7272 number.  West was given consent to**

**make calls by the debtor and intended recipient of the calls, Sharmaine Hunter, when she provided the number to the original creditor, AT&T.**

2. West never had plaintiff's consent to receive prerecorded or artificial voice calls at the 7272 phone number

**RESPONSE:      Objection; this request assumes facts not in evidence and erroneously assumes that the messages used by West were "artificial or pre-recorded voice" messages subject to the TCPA. Subject to and without waiving this objection, West admits that it currently has no evidence that plaintiff consented to receive prerecorded or artificial voice calls at the 7272 phone number, but denies that it did not have consent to leave messages at the 7272 number. West was given consent by the debtor and intended recipient of the calls, Sharmaine Hunter, when she provided the number to the original creditor, AT&T.**

3. The dialer West used to call plaintiff was an "automatic telephone dialing system" within the meaning of the FCC order January 4, 2008.

**RESPONSE:      Denied.**

4. At least one of the messages West left for plaintiff used a "prerecorded' or "artificial" voice, as those terms are used in the FCC Order dated January 4, 2008.

**RESPONSE:      Denied.**

## INTERROGATORIES

1. Identify all communications to 773-███-7272. A full response would include but not be limited to the method of contact (e.g. Dialer or manual dial), where the dialer was physically located, what kind of dialer was used, whether an automated or

"live" voice message was left, the date and time of each call and the text of the message that was left, if any.

**RESPONSE:        Objection; this interrogatory is overly broad, unduly cumbersome, excessive in time and scope and calls for a narrative response properly suited for a deposition.  Subject to and without waiving this objection, West's records indicate that calls were made to the 773-███7272 number on the following dates:**

| Date | Time | Method | Dialer location | Dialer Type | Message (type) |
|------|------|--------|-----------------|-------------|----------------|
| July 12, 2010 | 11:39 a.m. | dialer | Omaha | GC | None |
| July 12, 2010 | 5:48 p.m. | dialer | Omaha | GC | None |
| July 14, 2010 | 8:11 a.m. | dialer | Omaha | GC | None |
| July 14, 2010 | 12:29 p.m. | dialer | Omaha | GC | None |
| July 14, 2010 | 3:30 p.m. | dialer | Omaha | GC | None |
| July 16, 2010 | 9:11 a.m. | dialer | Omaha | GC | None |
| July 16, 2010 | 12:12 p.m. | dialer | Omaha | GC | None |
| July 16, 2010 | 3:34 p.m. | dialer | Omaha | GC | None |
| July 24, 2010 | 9:56 a.m. | dialer | Omaha | GC | None |
| August 3, 2010 | 12:18 p.m. | dialer | Omaha | GC | None |
| August 3, 2010 | 7:33 p.m. | dialer | Omaha | GC | None |
| August 9, 2010 | 11:58 a.m. | dialer | Omaha | GC | None |

| | | | | | |
|---|---|---|---|---|---|
| **August 11, 2010** | 2:38 p.m. | dialer | Omaha | GC | **None** |
| **August 17, 2010** | 11:05 a.m. | dialer | Omaha | GC | **None** |
| **August 17, 2010** | 8:50 p.m. | dialer | Omaha | GC | **Automated** |
| **August 21, 2010** | 10:19 a.m. | dialer | Omaha | GC | **None** |
| **August 23, 2010** | 5:16 p.m. | dialer | Omaha | GC | **None** |
| **August 23, 2010** | 8:23 p.m. | dialer | Omaha | GC | **None** |
| **August 25, 2010** | 12:50 p.m. | dialer | Omaha | GC | **None** |
| **August 27, 2010** | 11:19 a.m. | dialer | Omaha | GC | **None** |
| **September 1, 2010** | 12:21 p.m. | dialer | Omaha | GC | **None** |
| **September 2, 2010** | 2:05 p.m. | dialer | Omaha | GC | **None** |
| **September 2, 2010** | 5:07 p.m. | dialer | Omaha | GC | **None** |
| **September 4, 2010** | 1:35 p.m. | dialer | Omaha | GC | **None** |
| **September 7, 2010** | 8:50 p.m. | dialer | Omaha | GC | **None** |

2.      Identify all persons who took any steps toward collecting any debt that has ever been associated with the telephone number 773-███7272, and what steps those persons took. Please include persons involved in dialer campaigns, if applicable.

**RESPONSE:**          **Savalas Seamster; Collector**

**Mr. Seamster took an inbound call from an unidentified individual on July 12, 2010.**

**Jason Richards**
**Operation Strategy Manager**

**Mr. Richards supervises the team that designs and implements dialer campaigns.**

3.      Identify all policies, practices and procedures that are designed to prevent West from calling or using prerecorded or artificial voice messages for telephone numbers that do not belong to the debtor.

**RESPONSE:        Objection.  This interrogatory seeks the confidential and sensitive, proprietary information of West.  Objecting further, this interrogatory is overly broad, unduly cumbersome and excessive in time and scope.  Subject to and without waiving this objection, in general, West reasonably relies on the information provided to it by the client when attempting to communicate with a consumer.  For example, in this case, West called a number reasonably believing that it was contacting the debtor, Sharmaine Hunter.  Had West been notified that it was contacting a person other than the debtor, or that the number associated with the debtor was a bad number, the account would have been updated, the telephone number removed and calls to that number would have stopped.   West was first notified in this case that it was calling a wrong number when it was notified of this claim.  West's polices and procedures are to not call persons or leave voice messages for persons that are not the debtor.**

4.      Identify your defenses in this case, and all documents that support or refute such.

**RESPONSE:        Objection.  This interrogatory is overly broad, unduly cumbersome and calls for a  narrative response properly suited for a deposition.**

Objecting further, this interrogatory seeks disclosure of information protected by the attorney-client privilege and the attorney work produce doctrine. Subject to and without waiving this objection, see West's answer and affirmative defenses. See also the documents produced herewith. Investigation continues.

## DOCUMENT REQUESTS

1.      All documents that mention or pertain to the plaintiff, 773-███7272, or any symbol, number or other designations that is associated with Dominginho Powell.

**RESPONSE:       See West's account notes produced as Bates No. West 0001 – West 0008.**

2.      All documents that mention or pertain to the plaintiff, Jessica Derossett [Sharmaine Hunter], or symbol, number or other designation that is associated with Jessica Derossett [Sharmaine Hunter]. (We agree to keep these materials confidential).

**RESPONSE:       To the extent this request applies to Jessica Derossett, none. To the extent this request was intended to apply to Sharmaine Hunter, see West's account notes produced as Bates No. West 0001 – West 0008.**

3.      A copy of the script for any message used during any call to 773-███7272.

**RESPONSE:       Objection; this request seeks information that is not relevant or reasonably tailored to lead to the discovery of admissible information. Plaintiff's claims deal with the source of calls made by West, and the source of the messages left by West, and not the content of those messages. Therefore, the script used by West is not relevant to any of plaintiff's claims. Subject to and without waiving this objection, investigation continues.**

4.      A copy of the actual recording for any message used during any call to 773-
█7272

**RESPONSE:        Objection; this request seeks information that is not relevant or reasonably tailored to lead to the discovery of admissible information. Plaintiff's claims deal with the source of calls made by West, and the source of the messages left by West, and not the content of those messages.  Therefore, the script used by West is not relevant to any of plaintiff's claims.   Subject to and without waiving this objection, a copy of the only recording associated with the account, of an inbound call, is attached.**

5.      A copy of all correspondence ever sent by defendant with respect to the alleged debt West was attempting to collect in any call listed in the complaint.

**RESPONSE:        Objection.    This request is overly broad, unduly cumbersome and is not relevant or reasonably tailored to lead to the discovery of admissible information.   No correspondence was sent by West to plaintiff as the person responsible for the debt was a third party, Sharmaine Hunter.   Further, plaintiff's claims deal exclusively with alleged unlawful telephone calls to his cellular telephone, and not with any written correspondence.    Therefore, letters sent to a third party are not relevant, and would require West to disclose the confidential and personal information of a third party unrelated to this litigation.**

6.      A copy of the complaint and settlement agreement for any action or proceeding filed against you for violation of the TCPA.   If West is prevented from

disclosing settlement documents because of a confidentiality agreement, please produce the complaint and the terms of confidentiality.

**RESPONSE:** **Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information. Objecting further, evidence of other lawsuits and claims filed against West is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior lawsuits or claims against West are evidence of the validity of Plaintiff's current claims. Therefore, any lawsuits in the past cannot serve to buttress the merits of Plaintiff's case. The TCPA is a strict liability statute, with statutorily defined damages, so that evidence of prior complaints will also not affect plaintiff damages claim. Notwithstanding said objections, to the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.**

As to Objections:

/s/ James K. Schultz
Attorney for West Asset Management, Inc.

James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
55 West Monroe Street
 Suite 1120
Chicago, Illinois  60603
Telephone:  (312) 578-0993
Facsimile:  (312) 578-0991
E-Mail:       jschultz@sessions-law.biz

Attorney for West Asset Management, Inc.


## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2011, a copy of the foregoing

**West's Answers to Plaintiff's First Discovery Requests** was served on the following

attorneys of record via electronic mail at the address below.

Alexander Burke
BURKE LAW OFFICES
155 North Michigan Avenue, Suite 9020
Chicago, IL 60601




/s/ James K. Schultz
Attorney for Defendant West Asset Management, Inc.

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOMINGINHO POWELL, | ) | CASE NO. 1:10-CV-7852 |
| | ) | |
| PLAINTIFF, | ) | JUDGE DARRAH |
| | ) | |
| VS. | ) | |
| | ) | |
| WEST ASSET MANAGEMENT, | ) | |
| INC., | ) | TELEPHONIC DEPOSITION |
| | ) | TAKEN ON BEHALF OF |
| DEFENDANT. | ) | PLAINTIFF |

------------------------

DEPOSITION OF:  JILL A. JENSEN

DATE:  September 1, 2011

TIME:  2:30 p.m.

PLACE:  West Asset Management
7171 Mercy Road, Suite 200
Omaha, Nebraska

§ § §

A-P-P-E-A-R-A-N-C-E-S
FOR THE PLAINTIFF: (Present via telephone)
MR. ALEXANDER H. BURKE
BURKE LAW OFFICES, LLC
155 North Michigan Avenue, Suite 9020
Chicago, Illinois 60601
(312)729-5288 FAX 729-5289
ABurke@BurkeLawLLC.com

FOR THE DEFENDANT:
MR. JAMES K. SCHULTZ
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
55 West Monroe Street, Suite 1120
Chicago, Illinois 60603-5130
(312)578-0990 FAX 578-0991
jschultz@sessions-law.biz

MR. GREGORY C. HOGENMILLER
ATTORNEY AT LAW
7171 Mercy Road, Suite 250
Omaha, Nebraska 68106
(402)546-7076 FAX 384-6687
ghogenmiller@west.com

§ § §

2

I-N-D-E-X
CASE CAPTION ......................... Page   1
APPEARANCES ........................... Page   2
INDEX .................................. Page   3
TESTIMONY ............................. Page   4
ERRATA SHEET .......................... Page  45
REPORTER CERTIFICATE ................. Page  46

DIRECT EXAMINATION:
By Mr. Burke......................    Page   4

CROSS-EXAMINATION:
By Mr. Schultz....................    Page  39

REDIRECT EXAMINATION:
By Mr. Burke......................    Page  42

EXHIBITS:                        MARKED
1. West Asset Management, Inc's
    Responses to Plaintiff's
    First Discovery Requests....       4

§ § §

3

(Whereupon, the following proceedings were had,
to-wit:)
            (Exhibit No. 1 marked for
            identification.)
        JILL A. JENSEN,
    having been first duly sworn,
was examined and testified as follows:
        DIRECT EXAMINATION
BY MR. BURKE:
    Q.  Good afternoon.
    A.  Hello.
    Q.  Would you please state your name for the
record.
    A.  Yes, Jill Jensen.
    Q.  Ms. Johnson, are you employed?
        MR. SCHULTZ:  It's Jensen,
J-E-N-S-E-N.
        MR. BURKE:  Oh, sorry.
        THE WITNESS:  And it's Jill, like Jack
and Jill.
BY MR. BURKE:
    Q.  Okay, great.  Ms. Jensen, are you employed?
    A.  Yes.
    Q.  With whom are you employed?
    A.  West Asset Management.

4

    Q.  What is West Asset Management?
    A.  We're an accounts receivable management
firm or collection agency.
    Q.  What is your position with West Asset
Management?
    A.  I'm senior vice president of the
performance enhancement group.
    Q.  What is the performance enhancement group?
    A.  It's a group of departments that support
the operations with back office functions.
    Q.  How many -- how many other groups or
sections are part of the performance enhancement
group?
    A.  There's four departments.
    Q.  Okay.  What are those four, please?
    A.  There's training; business process
compliance and quality, which is one group; there's
operation strategy; and analytics.
    Q.  And you're in charge of those four
departments?
    A.  Yes.
    Q.  Does West -- is it okay with you if I refer
to West Asset Management as West?
    A.  Yes.
    Q.  Okay.  Does West sometimes use telephones

5

1  to attempt to collect debts?
2    A.  Yes.
3    Q.  Does West sometimes use automatic telephone
4  campaigns to attempt to collect debts?
5      MR. SCHULTZ:  I'm just going to object
6  to what you mean by automated telephone campaigns,
7  Alex.
8      As long as you're just talking about dialer
9  functions and not having any legal connotation to
10 that, I think it's okay, but I just want to make sure
11 that that's what we're talking about.
12     MR. BURKE:  That's what I mean.
13     MR. SCHULTZ:  Okay.
14     MR. BURKE:  I'm not asking for any
15 legal conclusions or concessions.  I just want the
16 facts.
17     MR. SCHULTZ:  Okay.
18     MR. BURKE:  I'll restate the question.
19 BY MR. BURKE:
20   Q.  Does West have dialers?
21   A.  Yes.
22   Q.  Are they GC dialers?
23   A.  When you say GC, can you describe that
24 more.  What do you mean by GC?
25   Q.  Well, I see GC on the collection notes that

6

1  I've looked at with respect to this case; I believe
2  GC means guaranteed contact dialer.
3    A.  Yes.
4    Q.  Is that correct?
5    A.  Yes.
6    Q.  Okay.  Can you tell me what the guaranteed
7  contact dialer is?
8    A.  It's -- it's a dialing feature that comes
9  with our collection platform, our collection software
10 application.
11   Q.  What is the collection software
12 application?
13   A.  It's FACS, F-A-C-S.
14   Q.  Are they both -- are both the GC dialer and
15 FACS, are those both Ontario Systems products?
16   A.  We purchased those from Ontario Systems,
17 yes.
18   Q.  Okay.  What does the GC dialer do?
19   A.  It will facilitate making phone calls based
20 on a predetermined pattern of calling to accounts
21 that we select on periods that we define.
22   Q.  So would you -- let's see.
23     Would it be accurate to say that a
24 predefined, preselected -- I'll start that question
25 over.

7

1    When the dialer makes phone calls, does
2  West call that a campaign?
3    A.  Yes, I guess in general.
4    Q.  Okay.  Would you explain to me the process
5  of putting together and implementing a dialing
6  campaign, you know, what -- what goes into designing
7  and implementing a dialer campaign?
8    A.  We would start with understanding what
9  portfolio of business we're going to work, what are
10 the characteristics of the accounts within that
11 portfolio, and then using collection knowledge from
12 people that have -- you know, are assigned to manage
13 those accounts, we would determine what are the best
14 phone numbers to call, what frequency, when to call.
15 I mean, you're really defining what treatment that
16 you want to call.
17     Within that, we would decide which of those
18 calls should be made using the dialer, and from that
19 list of criteria, the accounts would be selected into
20 a campaign on a given day or period and called.
21   Q.  And so how -- how are the calls placed?
22 Are those calls placed through the dialer?
23   A.  Some calls would be placed through the
24 dialer.
25   Q.  And how would other calls be placed?

8

1    A.  They might be placed manually.
2    Q.  Okay.  As part of the campaign, are the
3  phone numbers typically dialed by the dialer?
4    A.  Only -- only the numbers that are selected
5  to be in a dialer campaign.
6    Q.  Okay.  So as to the numbers that are
7  selected to be part of a dialing campaign, would it
8  be accurate to say that the dialer dials a number
9  rather than a human being?
10   A.  Yes.
11   Q.  How many dialers does West have?
12   A.  Two.
13   Q.  Are those both located in Omaha, Nebraska?
14   A.  I'm not sure.
15   Q.  Okay.  Does West also sometimes use
16 prerecorded messages or -- in order to stay away from
17 legal buzz words --
18     MR. SCHULTZ:  You know you got my
19 objection.
20     MR. BURKE:  Yeah, I'll make -- I'll
21 try to make it a little bit -- I'll change it.
22 BY MR. BURKE:
23   Q.  Does West sometimes leave messages for
24 debtors?
25   A.  Yes.

9

1      Q.  Telephone messages?
2      A.  Yes.
3      Q.  Okay.  Would it be accurate to say that
4  sometimes those telephone messages are left by a
5  human being?
6      A.  Yes.
7      Q.  Would it be accurate that sometimes those
8  telephone messages are left by a machine?
9      A.  Yes.
10     Q.  Okay.  In the case where telephone messages
11 are left by a machine, could you tell me, is there
12 like a form message that's played?
13     A.  I'm not sure what you mean.
14     Q.  Well, I'm trying to get a sense of whether
15 these messages are prerecorded without using that
16 word.
17         MR. SCHULTZ:  Well, just ask if
18 they're recorded rather than prerecorded.  I won't
19 object to recorded.
20         MR. BURKE:  Okay.
21 BY MR. BURKE:
22     Q.  When West leaves a message that is left by
23 a machine, is that message recorded ahead of time?
24     A.  Can I ask you a question?  Can I ask a
25 question of our attorney?

10

1      Q.  I would request that you not do that unless
2  it's a question on privilege.
3      A.  Okay.  Can you restate your question?
4      Q.  Sure.  Well, I'll put it this way:  During
5  a campaign if there are recorded messages that are
6  being used -- during an automated dialing campaign,
7  if there are recorded messages that are being used,
8  is the same message played for each person that
9  receives a message or is the message personalized for
10 the different people that might receive a message?
11     A.  The message -- that's a long question, so
12 I'm trying to think through what you all just said.
13 Without trying to be difficult, can you repeat that
14 again?  It was awfully long.
15         MR. SCHULTZ:  Alex, I mean, we're
16 dealing with an individual case here.  Do you just
17 want to ask maybe about the message that was left for
18 Mr. Powell?
19         MR. BURKE:  Well, I'm trying to get an
20 idea of --
21         MR. SCHULTZ:  I understand, I'm just
22 trying to figure out a way to make it go easier.
23         MR. BURKE:  Sure.  I'll try to go
24 backwards.
25

11

1 BY MR. BURKE:
2      Q.  Would you please have a look at Exhibit 1
3  that's been previously marked by the court reporter.
4      A.  Okay.
5      Q.  At Page 16 --
6         MR. SCHULTZ:  These don't appear to be
7  numbered.
8         THE WITNESS:  Yeah, they're not
9  numbered.
10        MR. BURKE:  Seriously?
11        MR. SCHULTZ:  Yeah, they're not
12 numbered.  The Bates number's on there, but -- from
13 when we produced them, but that's it.
14        MR. BURKE:  It doesn't say West Depo
15 Exhibit 1, West Depo Exhibit 2?
16        MR. SCHULTZ:  No.  Where would that
17 be, on the bottom?
18        MR. BURKE:  Yeah.  Okay.  This is the
19 second to last page.
20        MR. SCHULTZ:  Of the notes or the
21 discovery response?
22        MR. BURKE:  Of the whole kit and
23 caboodle.
24        MR. SCHULTZ:  I know, but we had it as
25 two different documents.  Are we talking about the

12

1 notes or discovery?
2         MR. BURKE:  Oh, yeah, okay, yes, it's
3  the second to last page of the notes.
4         MR. SCHULTZ:  Okay.  So it's -- I
5  think it's going to be West 007.
6         MR. BURKE:  Yes, yes.
7         THE WITNESS:  Okay.
8         MR. SCHULTZ:  Okay.
9         THE WITNESS:  All right.
10 BY MR. BURKE:
11     Q.  Do you recognize this document that you're
12 looking at?
13     A.  Yes.
14     Q.  Okay.  What is this document that you're
15 looking at that has the Bates numbers
16 West 0001 through 0008?
17     A.  I don't know if we're looking at the same
18 document.
19        MR. SCHULTZ:  We are, we can assume
20 that based on the Bates number, yeah.
21        THE WITNESS:  Okay, all right.
22 BY MR. BURKE:
23     Q.  Do you know what this generally is?
24     A.  Well, I think you're trying to describe our
25 account history if we're looking at the same

13

1  document.
2      Q.  Okay, great.  And what is the -- what is a
3  West account history?
4      A.  It's the documentation that would be
5  associated with the account placed with us in the
6  FACS system.
7      Q.  Okay.  Would it be accurate to say that
8  each time action is taken on the account, that action
9  should be recorded in the history?
10     A.  Yes.
11     Q.  Okay.  Directing your attention to the
12  entry on Page West 0007, on August 17th, 2010, at
13  8:50 p.m., I see an entry that says 3GBN, good
14  number, answering machine; do you see that?
15     A.  Yes.
16     Q.  Okay.  Do you have any idea what that entry
17  in the account history means?
18     A.  That indicates what route that the account
19  was -- the account status that it was in, and it
20  refers -- it's a -- tied to the comment above that.
21     Q.  Okay.  Can you tell me what the line above
22  that refers to?
23     A.  It refers to a phone call made at
24  8:50 p.m., on 8/17 of '10.
25     Q.  Was there a message left?

14

1      A.  Yes.
2      Q.  Okay.  Was a message left by a human being
3  or by the West automated system?
4      A.  It was left by the guaranteed contacts
5  dialer.
6      Q.  And was that message recorded ahead of
7  time?
8      A.  Yes.
9      Q.  Do you know what the message said based
10  upon your knowledge of the company or your knowledge
11  of the account or your review of these notes?
12     A.  Yes.
13     Q.  Okay.  Would you please tell me?
14     A.  It says, hello, this is -- this call is
15  from West Asset Management, a debt collector.  When
16  you receive this message, please call us toll-free at
17  (888)662-7547.  We thank you for your prompt reply.
18  Once again our number is (888)662-7547.
19     Q.  And I noticed that you seem to be reading
20  from something; would you tell me what that was,
21  please?
22     A.  It's just a sheet of paper with that
23  message on it.
24     Q.  Did you prepare that before the deposition?
25     A.  Yes.

15

1      Q.  Because you thought I might ask the
2  question?
3      A.  Because I reviewed the account history and
4  I was reviewing what took place on the call.
5      Q.  What did you do to figure out what message
6  was left?
7      A.  I contacted my dialer team and they
8  reviewed the account history, and they have a record
9  of what message was used on each account at each
10  time.
11     Q.  Now, is that a message that was used for
12  multiple calls or was that message completely unique
13  as to this phone call to the 7272 number?
14        MR. SCHULTZ:  I'm just going to object
15  to that a little bit here, Alex.  I think that first
16  of all it's not related to anything to do with this
17  case, but secondly it's just -- I'm unclear as to the
18  timing.  I mean, are you talking about the time the
19  message was left currently or what?
20        MR. BURKE:  I'm just trying to figure
21  out whether this message was left for other people
22  ever or was if this was like a message that was
23  recorded ahead of time that was left for multiple
24  debtors at any time.
25        THE WITNESS:  I wouldn't know that

16

1  until I would go out and do other research.
2  BY MR. BURKE:
3      Q.  But this particular message was recorded
4  ahead of time; is that correct?
5      A.  Yes.
6      Q.  Okay.  Directing your attention to Page 6
7  of the account history, it's West 0006.  Would it be
8  accurate to say that the first call to the 7272 phone
9  number is notated near the bottom of this Page 6?
10     A.  Yes.
11     Q.  Okay.  Did that call happen on
12  July 12th, 2010?
13     A.  Yes.
14     Q.  What about -- what about the notation here
15  tells you -- well, I'll start that over.
16        Was that call on July 12th, 2010, at
17  11:39 a.m., made using the GC dialer?
18     A.  Yes.
19     Q.  Was that call dialed by the dialer?
20     A.  If that's the same question as the last
21  one, yes.
22     Q.  Okay.  How can you tell?
23     A.  Because the furthest to the left notation
24  on that line says GC, and then the way -- if we go
25  passed the date stamp where it says RES, because of

17

1  how that note starts, those two things would tell me
2  that it's a dialer campaign call.
3      Q.  What is -- what does -- does GC refer to
4  the fact that it was the dialer that performed the
5  function for this notation?
6      A.  It would be a combination of that and the
7  note on the account.
8      Q.  Okay.  And you referred to the RES, what
9  does that mean?
10     A.  It means that we're calling the phone
11  number for the consumer.
12     Q.  Okay.  And then at the other end of the
13  line it says no answer; does that mean that there was
14  an attempted call, but nobody answered?
15     A.  Yes.
16     Q.  Okay.  If you turn the page to 7, please,
17  could you, please, count the outbound calls from the
18  7272 number that were made and dialed by the
19  GC dialer on Page 7?
20         MR. SCHULTZ:  Alex, we'll stipulate
21  that the discovery responses and that there's
22  25 calls, if that's acceptable to you rather than
23  having her count them.
24         MR. BURKE:  Yeah, I agree to that.
25         MR. SCHULTZ:  Okay.  So there's 25
                                                    18

1  calls through the dialer to the 7272 number.
2         MR. BURKE:  Agreed.
3         MR. SCHULTZ:  Okay.
4         MR. BURKE:  Can we go off the record
5  for a second?
6         MR. SCHULTZ:  Sure.
7         (Off the record.)
8         MR. BURKE:  Back on?
9         MR. SCHULTZ:  Sure.
10  BY MR. BURKE:
11     Q.  It looks like at the top of Page 7 there's
12  an inbound call from a 7272 number notation; do you
13  see that?
14     A.  Yes.
15     Q.  Do you know what that is?
16     A.  Yes.
17     Q.  What is it?
18     A.  It's a -- it's an inbound call that we
19  received from that phone number.
20     Q.  Did West make a recording of that inbound
21  call?
22     A.  Yes.
23     Q.  Okay.  Have you heard that recording?
24     A.  Yes.
25     Q.  Okay.  Do you know from where West learned
                                                    19

1  the phone number ending in 7272?
2         MR. SCHULTZ:  I'm just going to object
3  to the form of that.
4         THE WITNESS:  Okay.
5         MR. SCHULTZ:  Do you understand that
6  question?
7         THE WITNESS:  No, I think it's an
8  incomplete question.
9  BY MR. BURKE:
10     Q.  Okay.  West somehow learned the
11  7272 number, right?
12         MR. SCHULTZ:  I guess the confusion is
13  what do you mean by learned, Alex?  Do you mean they
14  got the number?
15         MR. BURKE:  Yes.
16         MR. SCHULTZ:  Are you talking about
17  like got it as far as the account or got it as
18  related to your client and they should stop?  I guess
19  that is my confusion.
20         MR. SCHULTZ:  I'm saying when did West
21  first associate the 7272 number with this account?
22         MR. SCHULTZ:  Okay.
23         THE WITNESS:  The phone number came
24  with the account placement from the client.
25
                                                    20

1  BY MR. BURKE:
2      Q.  Can you tell that from these account notes?
3      A.  Yes.
4      Q.  Okay.  Would you show me, please?
5      A.  The account on -- let's see, on Page 1,
6  you'll see that about 20 percent, 33 percent down the
7  page on Page 1, underneath the word debtor, there's
8  the phone number there, so that's the phone number.
9         Then you'd have to look at every single
10  line of history, but when a number is not received
11  there or changed from that place, you would always
12  see a line of history that indicates that either a
13  blank had been replaced and that number had been put
14  in or another number had been taken out and then that
15  number put in, and there is no line history that
16  indicates that it had ever been received.
17     Q.  Does the exclamation point after the
18  7272 there mean something?
19     A.  Yes.
20     Q.  What does it mean?
21     A.  It means do not call.
22     Q.  And that was placed after West learned that
23  it was calling someone other than Sharmaine Hunter
24  is that right?
25     A.  Yes.  It was placed there on 9/13 of '10.
                                                    21

1    Q.  Who is the creditor for this account?
2    A.  It's AT&T.
3    Q.  Is that an AT&T mobile account or a
4  residential account, do you know?
5    A.  I'm not -- not certain on that.
6    Q.  Okay.  Do you know where AT&T obtained the
7  7272 number?
8    A.  I believe that we do.  I believe that the
9  client has given us information as to where they
10  obtained it.  I don't know that we know specifically
11  at the time of the account, but the client has said
12  where they got the account number -- or the phone
13  number.
14    Q.  So the client -- so AT&T told West where it
15  got the phone number; is that right?
16    A.  Yes.
17    Q.  What did they say about where they obtained
18  this phone number?
19    A.  I've got that documented, but I don't have
20  that.  I don't know.
21    MR. SCHULTZ:  Alex, just for full
22  disclosure here, there is an affidavit that we've
23  obtained from AT&T that Jill took a look at this
24  afternoon.
25    THE WITNESS:  Oh, I looked at it, I

22

1  subsidiary of AT&T, Inc., parenthesis, AT&T,
2  parenthesis.
3    I have been with the company for over
4  31 years and have held my current position since
5  2008.
6    Item 2, in my position as manager of credit
7  and collections, I have access to AT&T's files and
8  records of commercial and consumer telecommunications
9  accounts maintained in the ordinary course of
10  business, including records reflecting the creation,
11  billing and servicing of AT&T commercial and consumer
12  telecommunication accounts.
13    I also have knowledge regarding the
14  placement of such accounts for collection with
15  collection agencies.
16    I am authorized and competent to give this
17  affidavit.
18    Bullet 3, on January 6, 2010,
19  Sharmaine Hunter opened an account with AT&T to
20  obtain residential telephone service, and then it
21  gives the account number and she refers to that as
22  the account.
23    Bullet 4, at the time the account was
24  opened, Sharmaine Hunter provided telephone number
25  (773 ▓ 7272 as contact number at which she could be

24

1  mean, earlier when I was reviewing the account.
2    MR. BURKE:  Can you e-mail that to me
3  right now or fax it?
4    MR. SCHULTZ:  I could -- if we want to
5  wait a minute, I could.  I could read this thing to
6  you if you want, it's pretty short, otherwise I could
7  probably have it e-mailed to you.
8    MR. BURKE:  Okay.  Why don't I have
9  the witness read it so I don't have you testifying.
10    MR. SCHULTZ:  All right.
11  BY MR. BURKE:
12    Q.  Would you please read the affidavit that's
13  just been handed to you?
14    A.  Yes.  Can I start with the title of it as
15  opposed to going through all the districts and who
16  versus who?
17    Q.  Yes.
18    A.  It's the affidavit of Mary C., and it's
19  Fournier.  I may mispronounce that.
20    MR. SCHULTZ:  F-O-R -- F-O-U-R --
21    THE WITNESS:  N-I-E-R.
22    State of Connecticut, County of New Haven,
23  Mary C. Fournier, being first duly sworn according to
24  law, deposes and says that I -- one, I'm a manager of
25  credit and collections for AT&T Services, Inc., a

23

1  reached.
2    Bullet 5, Sharmaine Hunter never advised
3  AT&T not to attempt to call her at the (773 ▓ 7272
4  telephone number.
5    6, after Sharmaine Hunter became delinquent
6  in payment on -- in her payment on the account, the
7  account was electronically placed with West for
8  collection on or about July 8th, 2010.
9    AT&T identified (773 ▓ 7272 as a
10  telephone number at which Sharmaine Hunter could be
11  reached.
12    I hereby affirm under penalty of perjury
13  that the ascertations of this affidavit are true.
14  And then it's signed and notarized on the 15th of
15  August, 2011.
16  BY MR. BURKE:
17    Q.  Okay.  What date?
18    MR. SCHULTZ:  August 15th, 2010.
19  BY MR. BURKE:
20    Q.  Do you have any independent knowledge of
21  how AT&T obtained the 7272 number?
22    A.  No.
23    Q.  Okay.  Does West have any information
24  regarding the plaintiff in this case,
25  Dominginho Powell, consenting to receive calls made

25

1  **with an auto dialer or a prerecorded message to the**
2  **7272 number?**
3     A. No.
4        **Q. Is there any point when -- when -- when**
5  **West is making dialer calls to a specific number over**
6  **a period of months and different campaigns, is there**
7  **any point at which West decides that it's time for a**
8  **human being to call and make an attempt by a live**
9  **human being to call?**
10    A. Can you kind of -- can you restate that?
11 I'm not --
12       MR. SCHULTZ: I was kind of lost.
13       THE WITNESS: That was pretty broad.
14 BY MR. BURKE:
15    **Q. Did a human being ever make a call to**
16 **Mr. Powell at the 7272 number?**
17       MR. SCHULTZ: I'm just going to object
18 to the characterization of the call to Mr. Powell. I
19 think we agreed we called the 7272 number, but not to
20 Mr. Powell.
21       MR. BURKE: That's fine.
22 BY MR. BURKE:
23    **Q. So did a human being ever dial the**
24 **7272 number from West that you know of?**
25    A. No.

26

1  tools that we use in our job. I mean, I don't know
2  that it's any different saying why do we make notes
3  in the computer, in the FACS system, versus putting
4  them on paper.
5  BY MR. BURKE:
6     **Q. Would it be fair that it's more sufficient**
7  **to use an auto dialer or a -- I'll rephrase that.**
8        **Wouldn't you say it's more efficient to use**
9  **the GC dialer than to use a human being dialing the**
10 **number with his fingers?**
11    A. Yes.
12    **Q. Would you say that it saves money to use**
13 **the GC dialer as opposed to having a human being use**
14 **their fingers to dial phone numbers?**
15    A. Yes. It's also more accurate.
16    **Q. Does West have any idea what the**
17 **outbound -- what the greeting on Mr. Powell's voice**
18 **mail was during this time? When I say this time, I**
19 **mean the time of these calls in 2010.**
20    A. No.
21    **Q. Why not?**
22    A. Because when we detected that there was not
23 a live person on the call, we did not leave a
24 message, we did not transfer the account to a
25 collector.

28

1     **Q. Why not?**
2     A. Because it was not part of the account
3  treatment strategy that we had designed for this
4  portfolio, and might have been in his portfolio, but
5  this account did not fall into those characteristics.
6     **Q. It's pretty easy to just pick up the phone**
7  **and dial a phone number, right?**
8        MR. SCHULTZ: Object. I think it's
9  argumentative.
10       You can answer the question still, Jill.
11       THE WITNESS: I don't know what you --
12 I mean, yeah, I think almost -- I mean, I hope every
13 employee we have can dial a phone.
14 BY MR. BURKE:
15    **Q. Okay. So why didn't -- why didn't West**
16 **have a human being dial this 7272 number, you know,**
17 **over the couple of months that it was collecting on**
18 **the account?**
19       MR. SCHULTZ: I'm just going to object
20 to the extent that it's been asked and answered
21 already.
22       MR. BURKE: You can go ahead and
23 answer.
24       MR. SCHULTZ: You can answer.
25       THE WITNESS: Oh, because there are

27

1     **Q. Well, there was one message left, right?**
2     A. Yes, the one that we discussed.
3     **Q. So would it be accurate to say that West**
4  **did not record the greeting on the voice mail on**
5  **that -- on that call?**
6        MR. SCHULTZ: The call where they left
7  the message on August 17th?
8        MR. BURKE: Right.
9        MR. SCHULTZ: Didn't record any of
10 that call.
11       THE WITNESS: Yeah.
12 BY MR. BURKE:
13    **Q. I'm just asking.**
14    A. I don't know. I did not look to listen to
15 that -- that message, so I don't know what -- what
16 was or wasn't recorded.
17    **Q. If the human being dialed the phone number,**
18 **like you or me -- I'll rephrase the question.**
19       **If you dial a phone number -- you pick up**
20 **the phone and put it to your ear and you dial a phone**
21 **number and you get someone's voice mail, typically**
22 **there's some sort of greeting that you would hear,**
23 **right?**
24    A. In our industry, yes. I would say there's
25 a variety of different ways that people have their

29

1 answering machine messages set up, everything from
2 nothing to just a variety. I mean, sometimes it's an
3 automated prerecorded message as well.
4 **Q. Sure.**
5 A. So it varies.
6 **Q. Sure. So if it was you that was making the**
7 **phone call, you would hear that message, right, if**
8 **there was a message?**
9 A. If there was a message, yes.
10 **Q. But if it's the dialer that's making those**
11 **calls, and voice mail picks up, the dialer doesn't**
12 **record or take -- hear the message that's on the**
13 **greeting; is that right?**
14 A. Again, I'm not sure whether the dialer is
15 separate from the recording equipment, so I don't
16 know if I know whether or not the recording equipment
17 is picking that up.
18 **Q. But certainly the dialer doesn't think**
19 **about the greeting might say like you might**
20 **think about it; is that right?**
21 A. Right. We have to tell the dialer how to
22 behave based on the characteristics of what's
23 happening on that call.
24 **Q. Rather than the substance of the greeting?**
25 A. Yes.

30

1 MR. BURKE: Okay. I'm almost done,
2 Jim. I'm just looking something up here.
3 MR. SCHULTZ: That's fine. I've got
4 four hours until my flight.
5 BY MR. BURKE:
6 **Q. One of the topics in my notice of**
7 **deposition is -- it says any defenses you raise in**
8 **this case including but not limited to prior express**
9 **consent, I'm just looking at the defenses in the**
10 **answer here, and one of the defenses is failure to**
11 **mitigate damages, which I think has already been**
12 **stricken.**
13 MR. SCHULTZ: Yeah, we can agree to
14 that.
15 MR. BURKE: Yeah.
16 BY MR. BURKE:
17 **Q. The fourth affirmative defense is that**
18 **West's equipment is not an automatic telephone**
19 **dialing system as defined by and subject to the TCPA.**
20 **And I'm going to ask you a factual**
21 **question, but it's -- you're going to think it sounds**
22 **like a legal question, but would you please tell me**
23 **in your own words why West thinks that its dialers**
24 **are not automatic telephone dialing systems?**
25 MR. SCHULTZ: I just want to object to

31

1 the question to the extent that there could be any
2 attorney-client or work product issues there, but I
3 think Jill can answer that question without
4 implicating any privileges.
5 THE WITNESS: Okay. Will you restate
6 your question then?
7 BY MR. BURKE:
8 **Q. Yeah, certainly don't want to know -- I**
9 **want to know West's factual position, but I don't**
10 **want to know anything related to that position**
11 **that your attorney told you.**
12 MR. SCHULTZ: I think --
13 MR. BURKE: So --
14 MR. SCHULTZ: -- we're going to have a
15 real tough time getting an answer.
16 MR. BURKE: Yeah, we are.
17 BY MR. BURKE:
18 **Q. Well, I'll just ask it: Do you have any**
19 **idea why the GC dialer that West uses is not an**
20 **automatic telephone dialing system?**
21 A. I can give you -- you know, I don't know
22 what my attorney would say or would say that as you
23 guys, you know, debate this later on --
24 **Q. Yeah.**
25 A. -- but I think there's some things that we

32

1 would -- that I would say would not make it an
2 automatic dialing equipment.
3 **Q. Okay. What are those things?**
4 A. It does -- we do not use it in any way to
5 randomly generate phone calls by random digits, we --
6 you know, that's a big part of it.
7 We don't -- I mean, to any large degree,
8 the equipment only dials the numbers that we tell it
9 to dial. It's really an interface between the -- the
10 collection application and the telephone switch.
11 MR. SCHULTZ: That's a fine answer.
12 BY MR. BURKE:
13 **Q. Anything else?**
14 A. I don't know. I mean, maybe we've just
15 been talking so long, nothing else is coming to my
16 mind right now.
17 **Q. Okay. Take your time. Do you know if**
18 **there are any other defenses that West intends to**
19 **bring in this case?**
20 A. I believe there's a question as to whether
21 or not your client has standing in this case.
22 **Q. Okay. Any other defenses? I see you're**
23 **looking over at Jim, which I don't think is a**
24 **terrible thing for this kind of question.**
25 MR. SCHULTZ: She wasn't really.

33

1  THE WITNESS: I'm really looking
2  across the corner of the room.
3  MR. SCHULTZ: No, she's looking that
4  direction, but it wasn't at me. I think like she was
5  looking at the painting on the wall.
6  MR. BURKE: Yeah, Jim, just looking at
7  the answer, it looks like there are five affirmative
8  defenses.
9  MR. SCHULTZ: Right.
10  MR. BURKE: She nailed the standing
11  one, didn't even intend that to be any sort of trick
12  question, and then that's No. 5 --
13  MR. SCHULTZ: Yeah.
14  MR. BURKE: -- automatic telephone
15  dialing system.
16  MR. SCHULTZ: Talked about mitigation
17  is dead and --
18  MR. BURKE: Right.
19  MR. SCHULTZ: -- No. 2 is dead, and
20  No. 1, as we all know, isn't really an affirmative
21  defense.
22  MR. BURKE: Okay. I think I'm almost
23  done, let me take about --
24  MR. SCHULTZ: The only other issue,
25  though, to point out is that to the extent that it

34

1  procedure, but, yes, there are things that we do to
2  try to make sure that we're not calling wrong
3  parties.
4  Q. Okay. What are those things?
5  A. Probably the first key would be that if we
6  talk to someone and they say that we've contacted the
7  wrong party, we remove those numbers.
8  Q. Okay. What else?
9  A. Two, we do rely on our client's information
10  who has a relationship with those consumers for
11  information.
12  Q. Okay. Anything else?
13  A. If we do skip tracing, we do not use those
14  numbers as verified numbers.
15  Q. What do you mean you don't use them as
16  verified numbers?
17  A. They -- they would be possible numbers
18  until we have some indication from the consumer that
19  this is their number or talk to a party and they
20  indicate that it's not their number.
21  Q. So would it be accurate to say that skip
22  trace numbers are not called using the dialer until
23  West has consent?
24  A. If -- if we -- if it's identified to be a
25  cell phone number, it would not be called using a

36

1  might not be an affirmative defense as it relates to
2  your client because it's not alleged that he was the
3  one, but there is also -- in reference to your debt
4  there was consent that, you know, we're arguing based
5  on what we got from Sharmaine Hunter.
6  MR. BURKE: Right.
7  MR. SCHULTZ: It's just not consent
8  from Powell.
9  MR. BURKE: Right. Give me a couple
10  of seconds to look over my stuff and I think I'm
11  done.
12  MR. SCHULTZ: Okay.
13  MR. BURKE: Okay. I have a couple
14  more.
15  BY MR. BURKE:
16  Q. I think that we -- would it be fair to say
17  that sometimes West calls the wrong person?
18  A. Not intentionally.
19  Q. Okay. So, yes, it happens unintentionally?
20  A. Yes.
21  Q. Okay. Do you know if West has any policies
22  or practices that are designed to prevent that from
23  happening?
24  A. I mean, yes, I don't know if they fall
25  under a, you know, strict definition of policy or

35

1  dialer.
2  Q. Okay. Anything else?
3  A. And those are some of the most common ways
4  that we would go through and assure that.
5  Q. West isn't entitled to use an auto -- a
6  GC dialer, is it?
7  MR. SCHULTZ: I'm just going to object
8  to the characterization, calling for a legal
9  conclusion as far as entitled is concerned, but,
10  Jill, if you think you can answer that question,
11  you're welcome to try.
12  THE WITNESS: Well, I guess is there a
13  hidden question within that? Is there some legal
14  meaning to the term entitlement that I wouldn't know?
15  BY MR. BURKE:
16  Q. I'm not trying to trick you into answering
17  any, you know, legal question. I'm just asking, you
18  know, whether West believes that it's entitled to use
19  a dialer, and there are a lot of different ways to
20  call somebody. We talked about manually dialing and
21  we talked about using a dialer and we talked about
22  the dialer being cheaper than manually calling and
23  you said it's more accurate.
24  You know, is there some -- are you aware of
25  anything that entitles West to use its GC dialer

37

1  other than, you know, the freedoms that, you know, we
2  all have to do things that are restricted only by the
3  laws that govern our society?
4      A.  Yeah, I guess I would say that it's a tool
5  that is allowed to be sold and we're allowed to
6  purchase, but we are allowed to use it within the
7  constrictions of other laws such as the laws
8  governing cell phone and their calling on such
9  equipment without permission from the consumer.
10     Q.  Did Ontario tell you that its dialer is not
11 subject to the Telephone Consumer Protection Act?
12     A.  I don't know, I've not had any
13 conversations to that impact personally on that.
14     Q.  Do you know if Ontario has ever indicated
15 to West that its GC dialers were not subject to the
16 TCPA?
17     A.  I could not tell you.
18        MR. BURKE:  Okay.  That's all for
19 today.
20        MR. SCHULTZ:  I've got a couple of
21 questions, and, Jill, you can refer back to
22 Exhibit No. 1 if you need to.
23        THE WITNESS:  Okay.
24
25
                                    38

CROSS-EXAMINATION
2  BY MR. SCHULTZ:
3      Q.  Can you tell us when this account that's
4  involved in this account was first placed with West?
5      A.  We listed the account on July 9th of
6  2010.
7      Q.  Okay.  And in whose name was the account
8  placed?
9      A.  Sharmaine Hunter.
10     Q.  Okay.  And who listed the account with
11 West?
12     A.  AT&T.
13     Q.  Okay.  And is AT&T the original creditor?
14     A.  Yes.
15     Q.  Okay.  Did AT&T provide West with some
16 contact information for Sharmaine Hunter?
17     A.  Yes.
18     Q.  Did that include the (773)███ 7272
19 telephone number?
20     A.  Yes.
21     Q.  Okay.  Did West thereafter call that
22 number?
23     A.  Yes.
24     Q.  Okay.  I think we testified -- or we agreed
25 earlier, it was 25 calls to that number?
                                    39

1      A.  Yes.
2      Q.  Okay.  Were any of those 25 calls answered
3  based on West's account records; in other words, did
4  someone ever pick up the phone and answer any of
5  those calls from what we could tell?
6      A.  No, nope, no individual picked up those
7  calls.
8      Q.  Okay.  And based on the account records,
9  were there ever any conversations with anybody when
10 West called that 7272 number?
11     A.  Can you say that again?
12     Q.  Sure.  When West called -- I know we have
13 that one inbound call.
14     A.  Right.
15     Q.  When West dialed the 7272 number, do those
16 records indicate that there was any conversations
17 with anybody?
18     A.  No.
19     Q.  Okay.  And when West was dialing the
20 7272 number on those 25 occasions, who were they
21 trying to reach?
22     A.  Sharmaine Hunter.
23     Q.  Okay.  Did Sharmaine Hunter ever tell West
24 to stop calling the 7272 number?
25     A.  No.
                                    40

1      Q.  Did anybody ever tell West to stop calling
2  the 7272 number?
3      A.  No.
4      Q.  Did West ever hear from the plaintiff, in
5  this case Mr. Powell, to stop calling the
6  7272 number?
7      A.  No.
8      Q.  Why did West stop calling the 7272 number?
9      A.  Because there was litigation action taking
10 place approximately somewhere the beginning of
11 September of 2010.
12        There was communication between the
13 attorney, and I apologize, I don't remember your
14 name, and our firm, and we at that time blocked the
15 number because it was told to us that, you know, it
16 was tied to Mr. Powell.
17     Q.  Okay.  So when West learned they were
18 calling the wrong party, they stopped calling?
19     A.  Yes.
20     Q.  And that's tied into that policy that you
21 testified to earlier about how West tries to --
22 doesn't intentionally call third parties?
23     A.  Yes.
24        MR. SCHULTZ:  Okay.  I don't have any
25 other questions.
                                    41

**Page 42**

1    MR. BURKE: I just have a couple.
2        REDIRECT EXAMINATION
3  BY MR. BURKE:
4    **Q. You testified a minute ago that on**
5  **9/13/2010, there was litigation?**
6    A. Well, the start of communication between
7  legal entities.
8    **Q. Okay. I mean, do you know when this case**
9  **was initiated by Powell?**
10    MR. SCHULTZ: Are you talking about
11  the formal filing of the lawsuit, Alex?
12    MR. BURKE: Right.
13    THE WITNESS: It's my understanding
14  that the formal filing was then subsequent to some
15  initial conversations.
16  BY MR. BURKE:
17    **Q. So the parties tried to settle before**
18  **the -- before the plaintiff sued, right?**
19    A. I don't know if I have a, you know,
20  blow-by-blow play of each and every conversation, but
21  at the time that you or your entity contacted our
22  groups, our legal department would have taken the
23  number out of the account and ensured that the phone
24  number was not called.
25    There is not -- on this particular account,

**Page 43**

1  there's no specific notes to that, but from my review
2  of the account and understanding what happened,
3  that's my understanding based on different people
4  that I talked to in our company.
5    **Q. Would it surprise you to know that the**
6  **lawsuit that this deposition has to do with was filed**
7  **on December 10th, 2010?**
8    A. No, that sounds familiar, that sounds about
9  right.
10    **Q. So what -- maybe I misunderstood, so what**
11  **do you think happened on 9/13/2010?**
12    A. When I was reviewing the account history,
13  one of the staff members in the legal department is
14  the one that changed the activity to ceasing all
15  calls to that number. And when I inquired as to why
16  I was told that at that point in time there were
17  initial conversations about this account.
18    **Q. Is that QSH, is that a legal person?**
19    A. Yes.
20    **Q. Okay. Who is that person?**
21    A. I'm not sure I know the last name, the
22  first name is Quinetta (phonetic).
23    MR. BURKE: Okay. That's all.
24    MR. SCHULTZ: Okay. We'll reserve.
25    MR. BURKE: Well, subject -- Jim, and

**Page 44**

1  I know you're not necessarily going to agree to this,
2  but I didn't ask certain questions based on our
3  conversations off the record --
4    MR. SCHULTZ: Yep.
5    MR. BURKE: -- about the substance of
6  a recording because I don't think that those
7  questions would be proper, and so, you know, probably
8  over your objection, I'm going to hold the deposition
9  open until we figure out, you know, what --
10    MR. SCHULTZ: Yep.
11    MR. BURKE: We'll have to deal with
12  those recordings.
13    MR. SCHULTZ: And we'll agree that
14  you've made your position as you've indicated, we're
15  going to object to any holding open of the
16  deposition. We think if you want to ask about the
17  recording, now is the time, but we'll deal with it
18  later.
19    MR. BURKE: Okay.
20    MR. SCHULTZ: We'll reserve signature.
21    MR. BURKE: Okay. Thanks, Jim.
22      (3:45 p.m. - Adjournment.)
23        ** ** ** **
24
25

**Page 45**

1        E-R-R-A-T-A
2    I, JILL A. JENSEN, wish to make the
3  following changes in the testimony as originally
4  given:
5  PAGE LINE SHOULD READ        REASON
6  ___ ___ _____ _____
7  ___ ___ _____ _____
8  ___ ___ _____ _____
9  ___ ___ _____ _____
10  ___ ___ _____ _____
11  ___ ___ _____ _____
12  ___ ___ _____ _____
13  ___ ___ _____ _____
14  ___ ___ _____ _____
15  ___ ___ _____ _____
16  ___ ___ _____ _____
17
18  _____
      WITNESS
19
20  _____
      GENERAL NOTARY PUBLIC
21
22    IN WITNESS WHEREOF, I hereunto affix my
23  signature and seal the ____ day of _____,
24  20___.
25  My Commission Expires:

```
 1              C-E-R-T-I-F-I-C-A-T-E
 2    STATE OF NEBRASKA   )
                          ) Ss.
 3    COUNTY OF DOUGLAS    )
 4         I, Cynthia A. Craig, General Notary Public
 5    in and for the State of Nebraska, do hereby certify
 6    that JILL A. JENSEN was by me duly sworn to tell the
 7    truth, the whole truth, and nothing but the truth;
 8    that the deposition as above set forth was reduced to
 9    writing by me.
10         That the within and foregoing transcript
11    was taken by me at the time and place herein
12    specified and in accordance with the within
13    stipulations; that the foregoing deposition is a true
14    and accurate reflection of the proceedings taken in
15    the above case.
16         That I am not counsel, attorney, or
17    relative of either party or otherwise interested in
18    the event of this suit.
19         IN TESTIMONY WHEREOF, I place my hand and
20    notarial seal this 12th day of September, 2011.
21
22
                  _____
23                CYNTHIA A. CRAIG
                  GENERAL NOTARY PUBLIC
24
25    My Commission Expires:
                                                    46
```