# Exhibit C

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOMINGINHO POWELL,          )
           Plaintiff,       )   Case No.
    vs.                     )   10 CV 7852
WEST ASSET MANAGEMENT,      )
INC.,                       )
           Defendant.       )

The deposition of DOMINGINHO POWELL, called as a witness herein for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ELIA E. CARRION, CSR No. 084.004641, a Certified Shorthand Reporter of said state, taken at 55 West Monroe Street, Suite 1120, Chicago, Illinois, on the 30th day of August, A.D. 2011, at 6:14 p.m.

**Page 2**

APPEARANCES:

BURKE LAW OFFICES, LLC,
(155 North Michigan Avenue, Suite 9020,
Chicago, Illinois 60601,
Tel: 312-729-5288,
Fax: 312-729-5289,
Aburke@BurkeLawLLC.com), by:
MR. ALEXANDER H. BURKE,
    appeared on behalf of the Plaintiff;

SESSIONS FISHMAN NATHAN & ISRAEL LLP,
(55 West Monroe Street, Suite 1120,
Chicago, Illinois 60603-5130,
Tel: 312-578-0990,
Fax: 312-578-0991,
jschultz@sessions-law.biz), by:
MR. JAMES K. SCHULTZ,
    appeared on behalf of the Defendant.


REPORTED BY: ELIA E. CARRION, CSR
     CERTIFICATE NO. 084.004641.

**Page 3**

1  (WHEREUPON, the witness was duly
2  sworn.)
3  DOMINGINHO POWELL,
4  called as a witness, having been duly sworn, was
5  examined and testified as follows:
6      EXAMINATION
7  BY MR. SCHULTZ:
8      Q.  Mr. Powell, we just met a few minutes
9  ago, but my name is Jim Schultz, and I'm here to ask
10 you some questions today regarding a lawsuit you
11 filed against my client, West Asset Management, Inc.
12     Could you please state your full name,
13 spelling your last name, for the record?
14     A.  First name is Dominginho, last name is
15 Powell, P-O-W-E-L-L.
16     MR. SCHULTZ:  Let the record reflect that this
17 is the deposition -- I'm sorry, I'm going to
18 mispronounce your name -- Dominginho --
19 BY THE WITNESS:
20     A.  Dominginho.  That's fine, I'm used to it.
21     MR. SCHULTZ:  -- deposition of Mr. Powell,
22 being taken pursuant to notice and agreement of the
23 parties, and pursuant to the applicable local rules
24 and Federal Rules of Civil Procedure.

**Page 4**

1  BY MR. SCHULTZ:
2      Q.  Mr. Powell, have you ever given a
3  deposition before?
4      A.  Yes.
5      Q.  Okay, so you're familiar with our
6  question and answer format here?
7      A.  The format, yes.
8      Q.  If at any point in time I ask you a
9  question and you don't understand, just let me know.
10 I'll be more than happy to rephrase it for you.
11 Okay?
12     A.  Okay.
13     Q.  If you need to take a break, talk to your
14 lawyer or anything like that, just let me know, and
15 we'll try to accommodate as best we can.  Okay?
16     A.  Okay.
17     Q.  Finally, if you could keep giving verbal
18 responses like you're doing, the yeses and the nos,
19 rather than shakes of the head or shakes of the
20 finger, whatever you might do, it'll make our court
21 reporter's job here a lot easier.  Okay?
22     A.  Yes.
23     Q.  What is your address?
24     A.  Currently, I'm at 

Toll Free: 800.708.8087
Facsimile: 312.704.4950

ESQUIRE
an Alexander Gallo Company

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL August 30, 2011

**Page 5**

1  ▮.
2  (WHEREUPON, there was a short
3  interruption.)
4  BY MR. SCHULTZ:
5  Q. That address on ▮, that's
6  in Chicago?
7  A. Yes, ▮.
8  There's a unit number.
9  Q. Okay, what's that?
10 A. ▮.
11 Q. How long have you lived there?
12 A. Since December.
13 Q. Who do you live there with?
14 A. My girlfriend.
15 Q. What's her name?
16 A. Ashley.
17 Q. Ashley Walsh?
18 A. Yeah.
19 MR. SCHULTZ: Off the record.
20 (WHEREUPON, discussion was had off
21 the record.)
22 BY MR. SCHULTZ:
23 Q. Besides you and Ashley, does anybody else
24 live there?

**Page 6**

1  A. No.
2  Q. All right.
3  Are you employed?
4  A. Yes.
5  Q. Who are you employed with?
6  A. North Shore University.
7  Q. Just generally --
8  A. Health Systems.
9  Q. Sorry. Health systems?
10 A. Yeah, mm-hmm.
11 Q. Generally, what do you do for North Shore
12 University Health Systems?
13 A. Registered medical assistant.
14 Q. What does that mean? What do you do on a
15 given day?
16 A. Patient care.
17 Q. Okay. I assume there was some education
18 that you went through to get that?
19 A. Yes.
20 Q. What's your highest level of education?
21 A. Trade school. I went to trade school for
22 it.
23 Q. So it's post high school?
24 A. Yes, after high school.

**Page 7**

1  Q. Like an associate's degree or?
2  A. Certificate.
3  Q. Okay.
4  A. Medical assistant's certificate.
5  Q. What's your date of birth?
6  A. ▮.
7  Q. Do you have a driver's license on you?
8  A. Yes.
9  Q. Can I take a look at it?
10 MR. BURKE: All this personal data we'd ask to
11 keep out of the record.
12 MR. SCHULTZ: Sure. To the extent we'll be
13 filing this.
14 BY MR. SCHULTZ:
15 Q. I'm just going to write down but not put
16 on the record your social security -- I'm sorry,
17 your driver's license number.
18 A. Okay.
19 Q. Will you just confirm for me that the
20 last four of that number is ▮?
21 A. Yes, it is.
22 Q. Okay. Mr. Powell, during the course of
23 this litigation we have -- we, being West Asset
24 Management, have served you with certain discovery.

**Page 8**

1  Do you know what I'm talking about when I
2  say that? Do you know what discovery is?
3  A. You could explain it for me.
4  Q. Okay. We've asked, through your
5  attorney, for you to provide some documents and
6  answer some questions for us.
7  A. Yes, yes.
8  Q. Have you participated in that?
9  A. Yes.
10 Q. During the course of the litigation,
11 we've asked for the production of certain documents.
12 Other than what you have provided to me
13 before today's deposition, are you aware of any
14 other documents that have been provided to West to
15 support your claims?
16 A. Yes.
17 Q. What other documents have you produced in
18 this lawsuit?
19 A. An assignment.
20 Q. Okay. That's the assignment from your
21 mother --
22 A. Correct.
23 Q. -- for this claim?
24 A. Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                                August 30, 2011

```
                                          9
 1    Q.  Besides the assignment, then, which I
 2  apologize, I should have mentioned, and then these
 3  bills, which we'll mark later on, is there anything
 4  else?
 5    A.  No, not that I can remember.
 6    Q.  I understand you're not the lawyer here,
 7  this is Alex's job. But to the best of your
 8  knowledge, as we sit here today, are there any other
 9  documents that you anticipate you'll have to support
10  your claims against West?
11    A.  Possibly, I could possibly get more
12  documentation from the actual phone provider.
13    MR. BURKE: And we --
14  BY THE WITNESS:
15    A.  It was too short a notice, I couldn't get
16  it. They have to mail it out. It's a process.
17  BY MR. SCHULTZ:
18    Q.  So we're talking about your phone bills?
19    MR. BURKE: Right, and we issued a subpoena
20  today asking for the relevant months.
21    MR. SCHULTZ: Okay.
22  BY MR. SCHULTZ:
23    Q.  Other than those documents that we're
24  going to get from the phone carrier, which I
```

```
                                         10
 1  understand is Sprint, any other documents that you
 2  anticipate?
 3    A.  Not at this time, no.
 4    Q.  Do you have any recordings of any calls
 5  you got from West?
 6    A.  That I'm not sure of.
 7    Q.  Okay.
 8    A.  Not at this time, no.
 9    Q.  Okay. Do you know where they would be,
10  if you had them?
11    A.  No.
12    Q.  Okay. What types of recordings might you
13  have?
14    A.  A recording of the voicemails left on my
15  cell phone.
16    Q.  Okay, so it would just be messages?
17    A.  Just messages, yes.
18    Q.  Do you have any recordings of any
19  conversations that you ever had with West?
20    A.  No conversations, no.
21    Q.  Have you ever heard any recordings
22  between yourself and anybody from West, in the
23  context of this litigation?
24    A.  No.
```

```
                                         11
 1    MR. SCHULTZ: Off the record.
 2    (WHEREUPON, discussion was had off
 3       the record.)
 4    (WHEREUPON, discussion was had off
 5       the record between the witness and
 6       Mr. Burke, outside the hearing of
 7       other counsel and the court
 8       reporter.)
 9  BY MR. SCHULTZ:
10    Q.  While you guys were gone, we marked this
11  as Exhibit 1.
12    (WHEREUPON, a certain document was
13       marked Powell Deposition Exhibit No.
14       1, for identification, as of this
15       date.)
16    (WHEREUPON, the document was
17       tendered to the witness.)
18  BY MR. SCHULTZ:
19    Q.  Mr. Powell, I've handed you a document
20  that we have marked as Powell Exhibit Number 1.
21       Do you recognize that document at all,
22  sir?
23    A.  Yes.
24    Q.  Can you just tell us what it is?
```

```
                                         12
 1    A.  Powell's response to West's discovery
 2  requests.
 3    Q.  I'd ask you to turn to Page 7. And just
 4  generally, I'm looking at the request for production
 5  number 1, where we basically asked you to identify
 6  all the documents that support your claim. And it
 7  just says in the response, it says, Plaintiff has
 8  attached all responsive documents that he has been
 9  able to locate.
10       I'm just wondering what documents you
11  might have been referencing there, if any.
12    A.  Phone bills.
13    Q.  Okay. Again, so as far as you're
14  concerned, then, we're just talking about the phone
15  bills and then the assignment from your mom?
16    A.  Correct.
17    Q.  Okay.
18    MR. BURKE: And I think that these responses
19  reflected counsel's misunderstanding of what
20  documents he had in his possession, and I've issued
21  a subpoena to try to get those phone bills for you,
22  Jim.
23    MR. SCHULTZ: And just so I'm clear, is the
24  counsel there me, or is it you?
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                                August 30, 2011

**Page 13**

1  MR. BURKE: Me, me.
2  MR. SCHULTZ: Okay, all right.
3  BY MR. SCHULTZ:
4  Q. Mr. Powell, what is it, generally, that
5  you allege West did wrong, or what did they do to
6  violate your rights?
7  A. Calling my cell phone looking for someone
8  else on many occasions.
9  Q. Did West ever call looking for you, as
10 far as you know?
11 A. No.
12 Q. And why don't you just tell me the last
13 four digits of your cell number?
14 MR. SCHULTZ: Is that okay, Alex?
15 MR. BURKE: Just not the whole thing.
16 BY THE WITNESS:
17 A. 7272.
18 BY MR. SCHULTZ:
19 Q. Is that the number that you claim West
20 was calling you at, unlawfully?
21 A. Yes. I switched phones at one point, but
22 yes.
23 Q. You switched phones before or after West
24 was calling?

**Page 14**

1  A. After.
2  Q. Okay. Did you switch in response to West
3  calling you?
4  A. No.
5  Q. Okay. When did you first get that 7272
6  cell phone number?
7  A. I'm not -- I don't remember at this time.
8  MR. BURKE: Jim, we should, just so we don't go
9  out on a tangent, I think the testimony would be
10 that he switched phones but not numbers.
11 THE WITNESS: Right.
12 MR. SCHULTZ: Okay.
13 BY MR. SCHULTZ:
14 Q. Okay, so you switched your carrier?
15 A. Right, transferred the number over.
16 Q. Your cell phone number is still 7272?
17 A. Correct.
18 Q. Are you still getting any calls from
19 West?
20 A. No.
21 Q. Is anybody else calling you at that 7272
22 number looking for Charmaine Hunter?
23 A. No.
24 Q. Have you ever received any calls from

**Page 15**

1  anybody besides West looking for Charmaine Hunter?
2  A. Yes.
3  Q. Who else has called you looking for
4  Charmaine Hunter?
5  A. I can't remember the name right now.
6  Q. Was it a debt collector?
7  A. Yes, it was.
8  Q. Do you know what type of debt they were
9  trying to collect?
10 A. No idea whatsoever.
11 Q. How many calls have you gotten from that
12 company?
13 A. This was a while ago also, but it was
14 over ten.
15 Q. Did you file a lawsuit against them?
16 A. Yes.
17 Q. Is that lawsuit pending?
18 A. No.
19 Q. If you look in your interrogatory
20 responses on Page 5, in response to Interrogatory
21 Number 10, you've identified a few, looks like four
22 other lawsuits that you've been involved with.
23 Reviewing number 10, answer number 10,
24 does that refresh your memory at all as to who may

**Page 16**

1  have been calling you?
2  A. Yes.
3  Q. Okay. Which one of those cases involves
4  a call to your cell phone looking for Charmaine
5  Hunter?
6  A. Collecto, I believe.
7  Q. Okay, that's the Powell versus Collecto
8  case?
9  A. Yes.
10 Q. And is that case -- I'm sorry, I think I
11 asked this. Is that case still pending or has that
12 been resolved?
13 A. It's been resolved.
14 Q. Was it settled?
15 A. It was settled.
16 Q. And was your claim in that case that
17 Collecto was calling your cell phone unlawfully
18 looking for Charmaine Hunter?
19 A. Correct.
20 Q. In your mind, was it basically the same
21 type of case as what you've got against West?
22 A. Yes.
23 Q. Okay. I assume you've never had a
24 relationship with West that you know of?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                                                August 30, 2011

**17**
1   A. Not to my knowledge, no.
2   Q. You're not aware of West ever calling
3   looking for you on a debt?
4   A. No.
5   Q. And you've never given this 7272 cell
6   phone number to West as a number they can contact
7   you?
8   A. No.
9   Q. In your mind, have you ever given consent
10  to West to call you at that number?
11  A. No.
12  Q. I'm sorry, I'm going to have to circle
13  back on this, but when you say you don't remember
14  how long you've had this telephone number, can you
15  give me an approximate? I mean is it like a year or
16  five?
17  A. Two years.
18  Q. About two years?
19  A. And that's approximate.
20  Q. Yeah, I understand. And you know what,
21  we've got the subpoena coming, so we'll get more
22  records. I'm just curious.
23  A. Okay.
24  Q. If you're off by a year or two, I don't

**18**
1   really care. Just so, if it's two years or
2   20 years.
3       Do you have a home phone?
4   A. No.
5   Q. Is the 7272 your primary number?
6   A. Yes.
7   Q. Is it really your only personal number?
8   A. Yes.
9   Q. Okay. When you first opened the account,
10  whatever, two or more or less years ago, was it with
11  Sprint?
12  A. No.
13  Q. Who was it originally service with?
14  A. Boost Mobile, I believe.
15  Q. Bush Mobile?
16  A. Boost, B-O-O-S-T.
17  Q. How long did you have Boost Mobile?
18  A. Maybe two, two, three years. I don't
19  entirely remember. It was ages ago, it feels like
20  that.
21  Q. And then at some point you brought that
22  number over to Sprint?
23  A. Correct.
24  Q. How long did you have Sprint?

**19**
1   A. About two years.
2   Q. Okay. And now who's your current
3   provider?
4   A. Sprint.
5   Q. Oh, okay. So you've only had this 7272
6   number serviced either by Boost or Sprint?
7   A. Correct.
8   Q. No other carriers?
9   A. No, no, I'm sorry.
10  Q. That's all right.
11      To the best of your knowledge, have you
12  ever gotten calls from West at any other number;
13  work number, mom's number, anything like that?
14  A. No.
15  Q. Okay. How many times did West call you?
16      And if you don't know, approximate is
17  fine.
18  A. Thirty to 50.
19  Q. Okay. Did you ever answer any of those
20  calls?
21  A. Yes.
22  Q. How many times did you answer a call?
23  A. I'm not sure how many times I answered.
24  Maybe two or three times.

**20**
1   Q. Did you ever talk to anybody at West?
2   A. Yes. West? Yes.
3   Q. Okay. Now, again, if you can just take a
4   look at your interrogatories and discovery responses
5   there, Exhibit Number 1.
6   A. What page?
7   Q. Page 3. I'm sorry, Interrogatory
8   Number 3. That asked you to identify each
9   communication that you had with West.
10      Do you see that?
11  A. Number 1?
12  Q. No, I'm sorry, number 3 --
13  A. Okay.
14  Q. -- of the interrogatory.
15  A. What you need?
16  Q. That question asked you to describe each
17  communication that you had with West, correct?
18  A. Yes.
19  Q. And in your interrogatory you state that
20  Plaintiff, being you, called West at least once to
21  find out who was calling him.
22  A. Correct.
23  Q. Okay. Other than you calling West that
24  one time, did you ever have any other conversations



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                                August 30, 2011

**21**

1 with West?
2   A.   No. I don't remember so.
3   Q.   Okay. And then if you flip the page to
4 Interrogatory Number 4, that generally asked you to
5 describe each communication that you had or that
6 anyone on your behalf had with West.
7        Do you see that?
8   A.   Yes.
9   Q.   And the answer indicates that your
10 attorney contacted defense counsel for West to
11 notify us that they were calling the wrong person,
12 right?
13  A.   Correct.
14  Q.   As far as you know, besides the one
15 incoming or the one call you placed to West and then
16 the conversation with your attorney, are you aware
17 of anybody else having any other conversations with
18 West, on your behalf?
19  A.   No.
20  Q.   Okay. So would it be fair to say, then,
21 that as far as your communications or you actually
22 communicated with West, there would probably be just
23 the two examples, the one time when you called West
24 and the one time when your attorney called West?

**22**

1   A.   Maybe I answered before, but
2 approximately, yeah.
3   Q.   Okay. When would you have answered
4 before?
5   A.   Like I said, it was between 30 and 50
6 calls, so I might have been busy or -- I just don't
7 remember if I did or if I didn't.
8   Q.   So as you sit here, do you have any
9 specific recollection of ever talking to West when
10 you answered a call?
11  A.   Other than saying hello, no.
12  Q.   Okay. Do you recall the substance of any
13 conversations that you had with West?
14  A.   No.
15  Q.   Do you know if you ever told West to stop
16 calling the number that they were calling on?
17  A.   I want to say yes, I do, but I don't -- I
18 couldn't give, you know, exact detail of when and
19 what time, what day or even for sure if I ever said
20 that, so.
21  Q.   Okay. Have you had a chance to ever look
22 at the records that West Asset produced in this
23 case?
24  A.   Repeat it.

**23**

1   Q.   Have you had a chance to look at the
2 documents that West has, in relation to the calls
3 that they were making to your cell phone, your 7272
4 number?
5   A.   No.
6   Q.   I'll represent to you that those records
7 indicate that there was never any calls that were
8 answered when they dialed the 7272 number.
9        Do you have any evidence that you could
10 point to that would refute or rebut that evidence?
11 You know, where you could say, no, I know I answered
12 a call on this date?
13  A.   No, I don't.
14  Q.   Okay. So it's a possibility that you
15 called -- you talked to or answered a call from
16 West, but you're not sure?
17  A.   Exactly.
18  Q.   Is it a possibility that maybe one of the
19 calls you answered wasn't actually from West, it was
20 from Collecto?
21  A.   It's possible.
22  Q.   And then would it likewise be possible
23 that you never really told West to stop calling you?
24  A.   It's possible.

**24**

1   Q.   Do you think there's any documents out
2 there where you could put your hands on, you could
3 say, oh, now that this is an issue in this case I
4 can go out and get these documents, and they're
5 going to show that I talked to West?
6        Are you aware of anything like that?
7   A.   No, 'cause the phone bills aren't even,
8 you know, detailed like that.
9   Q.   Okay. The cell phone that we're dealing
10 with here, the 7272 number, that looks like it's
11 part of a family plan?
12  A.   Correct.
13  Q.   Who else is on that plan besides
14 yourself?
15  A.   My girlfriend and my mom. My mom is the
16 primary.
17  Q.   You said your mom is the primary?
18  A.   Yes.
19  Q.   But you pay for part of this bill?
20  A.   Yes.
21  MR. SCHULTZ: Why don't we just go ahead and
22 mark this as number 2.
23       (WHEREUPON, a certain document was
24       marked Powell Deposition Exhibit No.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 25**

1  2, for identification, as of this
2  date.)
3  (WHEREUPON, the document was
4  tendered to the witness.)
5  BY MR. SCHULTZ:
6  Q. Mr. Powell, we just handed you what's
7  been marked as Powell Exhibit Number 2. That's a
8  three-page document. I believe it's the phone
9  records that you provided before today's deposition.
10  Does that look about right?
11  A. Yes.
12  Q. And in the middle, on the left-hand side
13  of the first page there's three phone numbers there,
14  right?
15  A. Yes.
16  Q. Those are the three numbers associated
17  with this account?
18  A. Yes.
19  Q. Do you know how long your mother has had
20  her account with Sprint?
21  A. I'm not entirely sure, but a lot longer
22  than me. Maybe, maybe three years.
23  Q. At some point in time you joined it, as
24  part of a family plan?

**Page 26**

1  A. Correct.
2  Q. And then at some point after that Ashley
3  joined it?
4  A. Right.
5  Q. Now, this bill, just for example, shows
6  about a $444 amount due, right?
7  A. Yes.
8  Q. And do you pay that whole amount or do
9  you pay a portion of it, or how does that work?
10  A. Sometimes I pay the whole thing, but, for
11  the most part, I just pay half.
12  Q. Okay. And does Ashley contribute, or are
13  you paying on behalf of Ashley?
14  A. She contributes.
15  Q. Okay. That's nice of her.
16  How do you usually pay it? Do you pay
17  your mom and she pays Sprint, or, just generally,
18  how does that work?
19  A. Either/or, depends on convenience.
20  Sometimes I just call in my half, she calls in her
21  half, or I just give her the money after the fact.
22  After my mom pays the whole thing, we just, you
23  know...
24  Q. Would you pay her cash or --

**Page 27**

1  A. Cash, cash.
2  Q. Do you ever pay her by check?
3  A. No.
4  Q. Do you ever, say, send a check to Sprint?
5  A. No.
6  Q. When you pay by phone, does that go on
7  like a credit card?
8  A. Credit card, yeah.
9  Q. Okay. Is that a credit card in your
10  name?
11  A. Yes.
12  Q. What type of credit card is it? Just
13  generally, is it a MasterCard, Visa?
14  A. Debit, debit MasterCard from my bank.
15  Q. Besides your mother, Ashley, and
16  yourself, are there any other people that use any of
17  these phones, that you know of, that are authorized
18  users of these three phone numbers?
19  A. No.
20  Q. Are there any other people that you're
21  aware of that's an authorized user of your 7272
22  number?
23  A. No.
24  Q. Besides the calls that you got for

**Page 28**

1  Charmaine Hunter from West and then from Collecto,
2  have you ever gotten another call for another party,
3  you know, some third party besides Charmaine Hunter,
4  on your 7272 cell phone number?
5  A. Looking for her?
6  Q. Just looking for anybody, no, a wrong
7  number?
8  A. Wrong numbers, yes.
9  Q. Have you ever had another debt collector
10  call you, looking for somebody?
11  A. No debt collectors, to my knowledge, no.
12  Q. Just somebody looking for a friend or
13  something?
14  A. Yeah, exactly.
15  Q. But you haven't had this repeated course
16  of getting 30 or 50 calls, like you did from West?
17  A. No.
18  Q. Besides what happened with Collecto and
19  West?
20  A. Correct.
21  MR. SCHULTZ: Mark that as 3, please.
22  (WHEREUPON, a certain document was
23  marked Powell Deposition Exhibit No.
24  3, for identification, as of this



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 29**

1              date.)
2         (WHEREUPON, the document was
3         tendered to the witness.)
4    BY MR. SCHULTZ:
5         Q.   Mr. Powell, I'm handing you now what's
6    been marked as Exhibit Number 3. This is a file
7    stamped copy of the complaint that was filed in this
8    lawsuit.
9         Have you ever seen that document before?
10        A.   Yes.
11        Q.   Okay. Do you know what a complaint is?
12        A.   Yes.
13        Q.   Okay. And I'm just trying to make this
14   so we're all on the same page.
15        This is generally where you outline what
16   your claim is against West, right?
17        A.   Right.
18        Q.   Okay. In your complaint here in
19   Paragraph 2 you state that West is calling you
20   upwards of 25 times a day.
21        You see that?
22        A.   Yes.
23        MR. BURKE: I think it's just a --
24   BY MR. SCHULTZ:

**Page 30**

1         Q.   Upwards of 25 times?
2         A.   Of 25 times.
3         Q.   So I'm saying, in the complaint here
4    you're alleging they called you at least 25 times,
5    right?
6         A.   Yes.
7         Q.   Based on what you testified to earlier,
8    you believe that they were actually calling you 30
9    to 50 times?
10        A.   Yes.
11        Q.   Okay. All right.
12        If we kind of look into this complaint a
13   little bit, starting on Page 3, in Paragraph
14   Number 18, going all the way to Paragraph 41, there
15   are some pretty specific allegations regarding the
16   dates and times of calls.
17        Do you see that?
18        A.   Mm-hmm.
19        Q.   Is that a yes? I'm sorry.
20        A.   Yes, I'm sorry, I'm sorry.
21        Q.   Did you keep a diary or a log of anything
22   of when you were getting calls from West?
23        A.   Other than missed calls on my cell phone,
24   no.

**Page 31**

1         Q.   So as far as you know, are the days and
2    times on here evidence that would have come off
3    from, directly from your cell phone?
4         A.   Say it again.
5         Q.   Sure. Do you know, for example, in
6    Paragraph 18, where you say West called you at -- on
7    7/12/10 at 5:48 p.m. --
8         A.   Mm-hmm.
9         Q.   -- do you know where that information
10   came from?
11        A.   No.
12        MR. BURKE: I can tell you, Jim.
13        MR. SCHULTZ: I'm assuming it's from the notes.
14        MR. BURKE: Right. We tried to settle the case
15   pre-suit.
16        MR. SCHULTZ: That's fine.
17        MR. BURKE: I had the notes.
18        MR. SCHULTZ: That's fine. I was curious what
19   you might have had.
20        MR. BURKE: Okay.
21   BY MR. SCHULTZ:
22        Q.   You never took any photographs or
23   anything of your caller IDs or saved your caller IDs
24   in any way?

**Page 32**

1         A.   Yes.
2         Q.   You did?
3         A.   Yes.
4         Q.   Okay. Where is that evidence, those
5    photographs?
6         A.   Maybe I didn't. I'm not sure.
7         Q.   Okay. Would there be a place where you'd
8    now be able to go look for those things, if they
9    exist?
10        A.   Yeah, I can check the camera.
11        Q.   If you find those, can you give them to
12   your lawyer?
13        A.   Yes, definitely.
14        Q.   Okay. Good.
15        MR. BURKE: And if I have them, Jim, I will
16   certainly give them to you.
17        MR. SCHULTZ: Yeah.
18   BY MR. SCHULTZ:
19        Q.   Continuing in paragraph -- you would
20   agree with me that, to the best of your knowledge,
21   West was attempting to collect a debt from Charmaine
22   Hunter?
23        A.   Yes.
24        Q.   And in Paragraph 15 of your complaint


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                             August 30, 2011

**Page 33**

1  there on Page 3, I guess you state that, right?
2    A.  Correct.
3    Q.  All right. And do you know who Charmaine
4  Hunter is?
5    A.  I have no idea, no.
6    Q.  All right. You don't have any friends,
7  neighbors, relatives that you are aware of, with
8  that name?
9    A.  No.
10   Q.  All right. And you have no idea what the
11 AT&T account may have involved?
12   A.  No.
13   Q.  You have no idea what Charmaine Hunter
14 did to incur that debt with AT&T?
15   A.  No.
16   Q.  All right. Since you knew that the calls
17 were coming in for Charmaine Hunter, is it fair to
18 say, then, that you knew that West wasn't calling
19 you?
20   A.  Yes.
21   Q.  Okay. You knew that West wasn't trying
22 to call you, that they were trying to call
23 Charmaine?
24   A.  Do you mean intentionally?

**Page 34**

1    Q.  Yeah. They were looking for Charmaine,
2  not you?
3    A.  Right.
4    Q.  Okay. I'm sorry, that's all I've got for
5  the complaint.
6         I'm sorry, I lied about that. Then I am
7  done with that.
8    MR. SCHULTZ: Off the record.
9         (WHEREUPON, discussion was had off
10            the record.)
11   MR. SCHULTZ: Let's go back on the record.
12   BY MR. SCHULTZ:
13   Q.  If you could take a look -- I skip around
14 a lot, I apologize. In fact I think we've gone into
15 these, so you can put them all to the side.
16        If we go to Exhibit Number 1, the
17 discovery responses. If you go to Page 2 of those,
18 the request for admission number 13. There we asked
19 you to admit that you never called West since
20 July 12, to advise that West -- to advise West that
21 they were calling the wrong number, basically, and
22 you deny that, right?
23   A.  Correct.
24   Q.  Okay. And then this further explanation

**Page 35**

1  that counsel informed defense counsel that his
2  client was improperly calling Powell before filing
3  suit, right?
4    A.  Correct.
5    Q.  I just want to make sure I understand
6  that.
7         After July 12, 2010, did you personally
8  ever call West to tell them that they were calling
9  the wrong person, or did you let your lawyer do
10 that?
11   A.  I pretty much left it up to my lawyer.
12   Q.  Okay. And then prior to July 12, 2010,
13 you called into West the one time, right?
14   MR. SCHULTZ: Let me strike that. Strike that.
15 BY MR. SCHULTZ:
16   Q.  I don't think I talked about that with
17 you.
18        At some point in time you called West to
19 tell them -- you called West, right?
20   A.  Right.
21   Q.  Do you know when that call took place?
22   A.  No.
23   Q.  Okay.
24   A.  Wrong number.

**Page 36**

1    MR. SCHULTZ: I'm going to play this again.
2  If you can get it, great. If not, no big deal.
3         (WHEREUPON, an audio clip was played
4            from Mr. Schultz's cell phone.)
5  "... West Asset Management. How can I help
6  you?"
7  "I'm just -- I'm just -- I just got a missed
8  call from this number. What is this?
9  "This is West Asset Management, calling for
10 Charmaine Hunter.
11 "Oh, okay."
12        (WHEREUPON, the audio clip played
13           from Mr. Schultz's cell phone was
14           concluded.)
15 BY MR. SCHULTZ:
16   Q.  Mr. Powell, I just played for you a
17 recording that West had of an incoming call from
18 somebody that's associated with the 7272 number,
19 that they were able to identify.
20        Does that sound like your voice?
21   A.  Yes.
22   Q.  Okay. Do you recall calling West?
23   A.  No.
24   Q.  Okay.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Page 37

1  A. I don't remember what day it was.
2  Q. Okay. Do you recall, though, having that
3  conversation with somebody at West?
4  A. Yes.
5  Q. Does that recording that we heard, does
6  that sound like the entirety of your conversation
7  with West?
8  A. Yes.
9  Q. And the way I heard it is you call in,
10 you say, I missed a call, I just got a missed call
11 from this number, who are you guys? And the person
12 on the phone says, this is West Asset Management,
13 calling for Charmaine Hunter?
14 A. Right.
15 Q. Or something like that, right?
16 A. Right.
17 Q. And then you say "okay" and hang up?
18 A. Right, correct.
19 Q. That was the end of your conversation, as
20 best you could recall?
21 A. Yes.
22 Q. Okay. Is there a reason why you didn't
23 tell West at that point that they were calling the
24 wrong number?

Page 38

1  A. At that point it was frustration, just,
2  you know, I just wanted to get off the phone; like
3  leave me alone, I'm not her.
4  Q. Okay, that's understandable.
5     Do you know when that would have been?
6  MR. SCHULTZ: Strike that.
7  BY MR. SCHULTZ:
8  Q. Do you know approximately when you called
9  West, as we heard in that recording?
10 A. Approximately, it has to be in the early
11 on, in the early goings of me receiving those calls,
12 so before July.
13 Q. Okay. Do you know --
14 A. Before July 12.
15 Q. Do you know when West first called you
16 looking for Charmaine Hunter?
17 A. No, I don't -- I don't remember exactly
18 when.
19 Q. Okay. According to West's records, their
20 first call to you was on July 12, 2010.
21    Does that sound about right, or do you
22 think you were getting calls before that?
23 A. I don't want to guess here, so I mean,
24 maybe I got some a little before then.

Page 39

1  Q. Okay. Do you know approximately how many
2  calls it may have been?
3  A. Maybe three or four.
4  Q. All right.
5  A. A couple.
6  Q. Was it right around when you got those
7  first three or three calls that you called in to
8  West?
9  A. Correct.
10 Q. West's records indicate that this
11 recording was received on July 12, 2010.
12    Do you think that's probably right?
13 A. That's about right, I guess, yes.
14 Q. You don't have any evidence, as you sit
15 here today, that would refute that?
16 A. No.
17 Q. At the time you got that -- at the time
18 you called into West, you had then gotten a few
19 calls from them already?
20 A. Possibly, yeah. It's hard to remember.
21 Q. Yes, I understand, I understand. I'm
22 just trying to test your memory the best you can.
23 You're doing fine.
24    At the time you called into West, were

Page 40

1  the calls -- had they annoyed you at that point in
2  time?
3  A. Yes.
4  Q. And at that point you wanted them to
5  stop?
6  A. Yes.
7  Q. And you didn't know really who was
8  calling you, is that fair?
9  A. At first, no, not until I called them
10 back.
11 Q. Right. So at that point can you explain
12 to me, then, why you didn't just say to the guy from
13 West, when you got him on the phone, hey, stop
14 calling me?
15 A. Just frustration. I didn't want to talk
16 to them anymore.
17 Q. And you never called West at any point
18 again to say, hey, stop calling me?
19 A. Right.
20 Q. So if -- you called in on approximately
21 July 12, after you had gotten less than ten calls
22 from West, is that fair to say?
23 A. Yes, yes.
24 Q. So then you get somewhere between 20 to


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**41**
1  40 more calls from West, right?
2      A.   Mm-hmm, yes.
3      Q.   And at no point do you ever answer any of
4  those calls and tell West to stop calling?
5      A.   Correct.
6      Q.   You never called West back and said, hey,
7  guys, stop calling me?
8      A.   Right.
9      Q.   Why didn't you do that?
10     A.   Because at that point I had left it up to
11 my counsel.
12     Q.   Okay. Now, when did you file the lawsuit
13 against Collecto?
14     A.   I don't remember.
15     Q.   Okay. Isn't it true you filed that in
16 about June of 2010?
17     A.   It's about right.
18     Q.   Okay, so about a month --
19     THE WITNESS: Right?
20 BY MR. SCHULTZ:
21     Q.   It's about a month before you called in
22 to West, right?
23     A.   Okay, yeah.
24     Q.   And at that point in time, isn't it true

**42**
1  that the reason why you didn't tell West to stop
2  calling is because you knew you had a potential TCPA
3  claim against them?
4      A.   Can you rephrase the question?
5      Q.   Sure.
6           What are you looking for in this case?
7  What is your understanding of what you're allowed to
8  recover?
9      A.   You mean money-wise?
10     Q.   Yeah. Or what else are you looking for
11 in this case?
12     A.   A thousand per call.
13     Q.   So it's your understanding that you get a
14 thousand bucks for each unlawful call that West made
15 to you?
16     A.   Correct.
17     Q.   So your case is worth more money if you
18 got 50 calls, as opposed to three calls, right?
19     A.   Correct.
20     Q.   So isn't it true that the reason why you
21 didn't tell that guy on July 12 to stop calling is
22 because you wanted more calls?
23     A.   I didn't want more calls, necessarily,
24 but...

**43**
1      Q.   You weren't going to complain about them?
2      A.   Right. But, you know, I wasn't going to
3  like, you know, tell them to stop calling. Like I
4  said, at that point I left it up to my counsel.
5      Q.   You took, then, no steps whatsoever to
6  try to get the calls to stop --
7      A.   No.
8      Q.   -- until your attorney told West?
9      A.   Correct.
10     Q.   Okay. How long have you been in a
11 relationship with Ashley Walsh, approximately?
12         I'm not going to get you in trouble with
13 her when I take her dep.
14     A.   Off and on, three to four years.
15     Q.   And if you go back to Exhibit Number 1,
16 those interrogatories on Page 4, on Interrogatory
17 Number 6 you were asked to identify every witness to
18 a communication you had with West, and you just
19 state that possibly Ashley Walsh was present during
20 some of the phone calls?
21     A.   Right.
22     Q.   Do you mean she was just there when your
23 phone rang?
24     A.   Or she -- or she noticed how I was when I

**44**
1  saw the call.
2      Q.   Okay.
3      A.   So eyewitness, yeah.
4      Q.   So as far as you know, Ashley's knowledge
5  of this case would just be her witnessing you
6  getting calls from West?
7      A.   Correct.
8      Q.   Do you know if Ashley was involved --
9      A.   Or me getting phone calls from someone
10 looking for someone else.
11     Q.   Okay. So who else have you gotten phone
12 calls from looking for someone else, besides West
13 and Collecto?
14     A.   Just those.
15     Q.   Okay. Have you talked to Ashley about
16 this case?
17     A.   No.
18     Q.   Okay. Does she know where you're at
19 right now?
20     A.   Well, she -- no, not really.
21     Q.   Does she understand that she was
22 identified as a possible witness in this case?
23     A.   Well, yeah.
24     Q.   Okay. What is your understanding of what



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 45**

1  Ashley would testify to, if anything, in this case?
2  A. If you were to ask her pretty much the
3  same questions you asked me, she would be like,
4  yeah, I remember he used to get calls looking for
5  someone, looking for someone else a lot.
6  Q. Okay. Do you know if Ashley ever
7  witnessed you having any conversations with West?
8  A. No.
9  Q. All right.
10  MR. BURKE: Where is Ashley?
11  MR. SCHULTZ: Interrogatory 6 on Page 4.
12  BY MR. SCHULTZ:
13  Q. I'm going to direct your attention back
14  to Interrogatory Number 10, regarding the other
15  lawsuits.
16  A. Mm-hmm.
17  Q. Powell versus PLS, do you know what the
18  nature of that lawsuit was?
19  A. Yes.
20  Q. What was that for?
21  A. They had me signing bogus documents.
22  Q. Okay. This PLS, is that the Payday Loan
23  Stores?
24  A. Yes.

**Page 46**

1  Q. Do you know if there's a TCPA claim in
2  that lawsuit?
3  A. I'm not sure.
4  Q. If you don't know, you don't know.
5  MR. BURKE: Just say what you know.
6  BY THE WITNESS:
7  A. I'm not sure.
8  BY MR. SCHULTZ:
9  Q. Okay. What's the status of that case?
10  Is it settled?
11  A. It's resolved.
12  Q. Okay. Do you know if that was filed in
13  Federal Court?
14  A. I don't know.
15  Q. Okay. What was Powell versus Rice
16  Property Management?
17  A. That was my landlord, or ex-landlord,
18  didn't give me my security deposit.
19  Q. Okay. Was that filed in Circuit Court of
20  Cook County, do you know?
21  A. I'm not sure.
22  Q. Did Mr. Burke represent you in that case?
23  A. Yes.
24  Q. Did Mr. Burke represent you in the Payday

**Page 47**

1  Loans case?
2  A. Yes.
3  Q. Did he represent you in all these cases
4  that we see?
5  A. Yes.
6  Q. What was the case against Torres Credit
7  about?
8  A. The debt collection.
9  Q. Okay. Was that a case where Torres was
10  trying to collect from a third party again?
11  A. They were looking for me.
12  Q. So do you know, is that an FTCPA [sic]
13  claim?
14     If you don't know, you don't know.
15  A. I don't know.
16  Q. Do you know if there was a TCPA claim
17  there?
18  A. I don't know.
19  Q. Do you know if Torres Credit ever called
20  you on your cell phone?
21  A. They did.
22  Q. Do you know if that was filed in Federal
23  Court?
24  A. I don't know.

**Page 48**

1  Q. What's the status of that case?
2  A. That's resolved.
3  Q. Okay. I think I asked already, but just
4  on the Collecto case, is that resolved?
5  A. That's resolved, yes.
6  Q. So do you have any other litigation
7  besides this case that's currently pending?
8  A. No.
9  Q. All right. Were any of these cases, do
10  you know, class actions?
11  A. No.
12  Q. Okay. Did West ever --
13  MR. SCHULTZ: Strike that.
14  BY MR. SCHULTZ:
15  Q. I think you testified to this already.
16     West left you messages on your cell
17  phone, right?
18  A. Yes.
19  Q. Did they leave a message every time they
20  called?
21  A. Basically, yes.
22  Q. Did you ever listen to those messages?
23  A. Yes.
24  Q. What would you do after you listened to



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 49**

1 the message?
2   A.  Just stop listening, just leave it on the
3 phone.
4   Q.  Did you leave it or did you delete it?
5   A.  I didn't delete them, no.
6   Q.  Do you still have them on your phone now?
7   A.  No.
8   Q.  Do you know where the contents of those
9 messages might be now?
10  A.  Where?
11  Q.  Yes.
12  A.  They delete after so long.
13  Q.  Okay. So as far as you know, they don't
14 exist anywhere else?
15  A.  As far as I know, no.
16  Q.  Do you know -- do you recall what the
17 message stated?
18  A.  Automated, sounded like an answering
19 machine, saying they're looking for Charmaine
20 Hunter.
21  Q.  So it sounded like a computer voice?
22  A.  Definitely, yes.
23  Q.  To the best of your recollection, the
24 message stated it was looking for Charmaine Hunter?

**Page 50**

1   A.  Yes.
2   Q.  Was it the same message over and over and
3 over again?
4   A.  Yes.
5   Q.  When you played that message, did it
6 cause you to lose some of the minutes on your cell
7 phone?
8   A.  Yes.
9   Q.  Do you have a plan that doesn't have
10 unlimited minutes?
11  A.  At the time -- well, I don't care what
12 phone company you got. If it says unlimited, it's
13 not unlimited. I have to pay for everything. Every
14 time I pick up the phone, I've got to pay for it.
15  Q.  Is one of your claims in this case that
16 every time you listened to one of those voicemails,
17 you had to pay for it?
18  A.  Right.
19  Q.  Do you know how much you would have had
20 to pay each time you listened to a message?
21  A.  The numbers I don't exactly have. I just
22 know per call, per minute they charge something.
23  Q.  All right.
24      I just want to make sure. Other than

**Page 51**

1 Collecto and West, nobody else was calling you on
2 your cell phone looking for Charmaine Hunter?
3   A.  Correct.
4   Q.  Do you know what type of debt Collecto
5 was trying to --
6   A.  No idea.
7   Q.  What kind of debt Collecto was trying to
8 collect from Charmaine Hunter?
9   A.  No idea, no.
10  Q.  So you don't recall if it was the same
11 AT&T debt?
12  A.  No, I don't know.
13  Q.  Do you have any idea how West got your
14 7272 number associated with Charmaine Hunter?
15  A.  No.
16  Q.  All right.
17      MR. SCHULTZ:  I think that's about it. If you
18 can just give me a couple of minutes to go over my
19 notes.
20      (WHEREUPON, a recess was had.)
21 BY MR. SCHULTZ:
22  Q.  Just so I'm clear, I understand that you
23 don't have a good approximation of how long you've
24 had the 7272 cell phone number, but you had it at

**Page 52**

1 Boost, and you had it at Sprint, right?
2   A.  Correct.
3   Q.  And somewhere, two, three, four years
4 you've had the phone, then, right?
5   A.  Correct.
6   Q.  You don't know who may have had that
7 number before you?
8   A.  No.
9   Q.  All right.
10      MR. SCHULTZ:  That's all the questions I've
11 got.
12            EXAMINATION
13 BY MR. BURKE:
14  Q.  I have a couple, I guess, questions for
15 Domi.
16      Domi, did you ever tell West that it was
17 okay for them to record phone calls that you made to
18 them?
19  A.  Never, no.
20  Q.  Were you aware that West was recording
21 this phone call between you and West?
22  A.  No.
23  Q.  Isn't it true that we have -- isn't it
24 true that we originally thought Collecto was calling



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                                August 30, 2011

**Page 53**

1 you, after we sued Collecto?
2 MR. SCHULTZ: Can I just -- you said "we." I
3 don't want you to waive any privilege.
4 MR. BURKE: Okay, I'll rephrase it.
5 BY MR. SCHULTZ:
6 Q. Isn't it true that you thought that
7 Collecto was calling you, after we had sued
8 Collecto?
9 A. True, yes.
10 Q. Isn't it true that it took a substantial
11 amount of time to figure out that it wasn't Collecto
12 that was calling you?
13 A. Yes.
14 MR. BURKE: Okay, that's all.
15     FURTHER EXAMINATION
16 BY MR. SCHULTZ:
17 Q. I hate to do this, but I have to get some
18 understanding of what we're dealing with. I think
19 there's a history here that I'm not privy to, so.
20 When was Collecto calling you?
21 Do you remember when they first started
22 calling you?
23 A. Not when they first started calling me,
24 no.

**Page 54**

1 Q. Do you know --
2 A. It was early 2009, 2010.
3 Q. Early 2010.
4 Do you know when, about, the calls
5 stopped?
6 A. No, I don't -- I don't remember those
7 dates either.
8 Q. You said that as best as you could
9 recall, when West called you, you thought they were
10 leaving messages most, if not all the time, right?
11 A. Right.
12 Q. You said that you listened to -- did you
13 listen to all the messages or some of them?
14 A. I didn't listen to all of them. Some
15 numbers were the same, some were different. So the
16 ones that I recognized associated with West, they
17 went straight to voicemail, and they just stayed
18 there.
19 Q. The messages you got from West, did they
20 say that this was a call from West or something to
21 that extent?
22 A. Yes.
23 Q. So why was there a problem identifying
24 that these calls were not from Collecto but from

**Page 55**

1 West?
2 A. Sometimes they would leave messages,
3 sometimes they wouldn't. Sometimes it would be --
4 when it went to my voicemail, it would be right in
5 the middle of a message. It was all automated, so
6 in the time -- by the time my voicemail picked up,
7 they were already leaving the message.
8 Do you know what I mean?
9 Q. Yeah, I gotcha. It was cut off,
10 basically?
11 A. It was cut off the man saying -- like
12 some messages would be, as soon as I hit play, "for
13 Charmaine Hunter," and that was it. It was in the
14 middle of their spiel.
15 Q. When you testified earlier that you
16 thought there were 30 to 50 calls from West, how is
17 it that you're -- as you sit here today, you can
18 distinguish the West calls from the Collecto calls?
19 A. The number -- the number I associated on
20 the voicemails.
21 Q. Okay. So at some point in time you
22 figured out that, for lack of -- 1111 was a West
23 number?
24 You know what I mean by 1111?

**Page 56**

1 A. Yes, associated the number, yeah.
2 Q. So you were able to look at your phone
3 and say, oh, there's 1111 again, that's West calling
4 you?
5 A. Right.
6 Q. As you sit here today, you think there
7 was between 30 to 50 of those calls?
8 A. Right.
9 Q. But it wasn't until later on that you
10 figured out it was actually West calling, is that
11 what you were saying before?
12 A. It wasn't up until the 50, it was kind
13 of, you know, early goings on in the calls that I
14 recognized and after listening to the voicemails.
15 Q. Do you know when you settled the Collecto
16 case?
17 Was it in 2010 or 2011?
18 A. I don't really remember.
19 Q. Okay.
20 MR. SCHULTZ: I'm guessing there's
21 confidentiality on some of these agreements.
22 MR. BURKE: Yeah, it was like the settlement,
23 the case was dismissed somewhere in the winter
24 of 2010, 2011.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 57**

1  THE WITNESS: Okay.
2  BY MR. SCHULTZ:
3  Q. All the lawsuits that we talked about
4  earlier, in response to Interrogatory Number 10,
5  were all those cases settled?
6  A. What do you mean settled?
7  Q. Did you try any of those cases? Did you
8  go to trial on any of them?
9  A. Yeah.
10  MR. BURKE: No.
11  THE WITNESS: No?
12  BY THE WITNESS:
13  A. No.
14  BY MR. SCHULTZ:
15  Q. You didn't try any of the cases?
16  A. No.
17  MR. SCHULTZ: Alex seems pretty sure of that.
18  BY MR. SCHULTZ:
19  Q. As far as you know, did you get paid on
20  all those cases when they were resolved?
21  A. Yes.
22  Q. You didn't lose any of them, like on a
23  motion, that you're aware of?
24  A. Right.

**Page 58**

1  MR. SCHULTZ: I think that's all I've got.
2  FURTHER EXAMINATION
3  BY MR. BURKE:
4  Q. Okay, I have some followup maybe to just
5  clear up the record on some of the stuff about these
6  cases.
7  Your case against Collecto was a class
8  action, right?
9  A. Yes, yes.
10  Q. Okay. The case against Torres was an
11  individual suit, right?
12  A. Right.
13  Q. The case against PLS was a class action,
14  right?
15  A. Yes.
16  Q. The case against the property management
17  company was also a class action, right?
18  A. Yes.
19  Q. We lost the motion to compel arbitration
20  in the PLS case, didn't we?
21  A. Yeah.
22  Q. We settled after that, right?
23  A. Yes.
24  Q. The case against Torres was not a TCPA

**Page 59**

1  case, was it?
2  A. No.
3  MR. BURKE: I don't think it was.
4  MR. SCHULTZ: I don't think it was either. It
5  looked like a Florida case.
6  MR. BURKE: That's it.
7  MR. SCHULTZ: For the questions you mean?
8  MR. BURKE: Yeah.
9  MR. SCHULTZ: Sorry. Just maybe I should leave
10  it and ask you, Alex.
11  FURTHER EXAMINATION
12  BY MR. SCHULTZ:
13  Q. The PLS, the Torres and Collecto, those
14  were all class actions?
15  A. Yeah.
16  MR. BURKE: Torres was not a class action.
17  MR. SCHULTZ: Torres was not, okay.
18  BY MR. SCHULTZ:
19  Q. The PLS, the one against Payday Loan
20  Stores, was?
21  A. Right.
22  Q. I think you just testified that there was
23  a TCPA claim there?
24  A. Those numbers?

**Page 60**

1  MR. BURKE: I think there was.
2  BY MR. SCHULTZ:
3  Q. Do you know if that was settled on a
4  class-wide basis?
5  MR. SCHULTZ: And again, I don't care if you
6  answer these questions.
7  MR. BURKE: Yeah, I mean, I can't really
8  testify, but if you look it up, it'll show that
9  arbitration was compelled.
10  MR. SCHULTZ: Okay.
11  MR. BURKE: Individual arbitration was
12  compelled.
13  MR. SCHULTZ: All right.
14  BY MR. SCHULTZ:
15  Q. So you were never -- there was never a
16  motion for class certification, as far as you know,
17  that was granted, appointing you as a class
18  representative?
19  A. Right.
20  Q. On the Collecto case, were you ever
21  appointed class representative in that case?
22  A. No.
23  Q. So that case settled on single plaintiff
24  cases?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 61**

```
1    A.   Yes.
2    Q.   As far as you know, have you ever been
3    appointed the representative of a class, to serve as
4    the class representative?
5    A.   No.
6         MR. SCHULTZ: That's all I've got.
7         MR. BURKE: That's all.
8         We will reserve.
9              FURTHER DEPONENT SAITH NOT.
```

**Page 62**

```
1    STATE OF ILLINOIS )
2                     ) SS:
3    COUNTY OF C O O K )
4
5         I, ELIA E. CARRION, a Certified Shorthand
6    Reporter of said state, do hereby certify:
7
8         That previous to the commencement of the
9    examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12
13        That the foregoing deposition transcript
14   was reported stenographically by me, was thereafter
15   reduced to typewriting under my personal direction
16   and constitutes a true record of the testimony given
17   and the proceedings had;
18
19        That the said deposition was taken before
20   me at the time and place specified;
21
22        That I am not a relative or employee or
23   attorney or counsel, nor a relative or employee of
24   such attorney or counsel for any of the parties
```

**Page 63**

```
1    hereto, nor interested directly or indirectly in the
2    outcome of this action.
3
4         IN WITNESS WHEREOF, I do hereunto set my
5    hand of office at Chicago, Illinois, this 11th day
6    of September, 2011.
7
8    C.S.R. Certificate No. 084.004641.
```

**Page 64**

```
              I N D E X
WITNESS                    EXAMINATION
DOMINGINHO POWELL
     By Mr. Schultz          3, 53, 59
     By Mr. Burke            52, 58

              E X H I B I T S
NUMBER                     PAGE/LINE NUMBER
Powell Deposition Exhibit No. 1   11    13
Powell Deposition Exhibit No. 2   24    24
Powell Deposition Exhibit No. 3   28    23
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

DOMINGINHO POWELL                                         August 30, 2011

---

Page 65

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4
 5   DOMINGINHO POWELL,        )
 6        Plaintiff,           )   Case No.
 7   vs.                       )   10 CV 7852
 8   WEST ASSET MANAGEMENT,    )
 9   INC.,                     )
10        Defendant.           )
11
12      I hereby certify that I have read the
13   foregoing transcript of my deposition given at the
14   time and place aforesaid, consisting of Pages 1 to
15   61, inclusive, and I do again subscribe and make
16   oath that the same is a true, correct and complete
17   transcript of my deposition so given as aforesaid,
18   and includes changes, if any, so made by me.
19              DOMINGINHO POWELL
20   SUBSCRIBED AND SWORN TO
21   before me this    day
22   of        , A.D. 201 .
23      Notary Public
24
```

Page 66

```
 1           DEPOSITION ERRATA SHEET
 2
 3   Assignment No. 267680
 4   Case Caption:  POWELL v. WEST ASSET MANAGEMENT, INC.
 5
 6        DECLARATION UNDER PENALTY OF PERJURY
 7      I declare under penalty of perjury that I have
 8   read the entire transcript of my Deposition taken in
 9   the captioned matter or the same has been read to
10   me, and the same is true and accurate, save and
11   except for changes and/or corrections, if any, as
12   indicated by me on the DEPOSITION ERRATA SHEET
13   hereof, with the understanding that I offer these
14   changes as if still under oath.
15        Signed on the _____ day of
16   _____, ____.
17   _____
18        DOMINGINHO POWELL
```

Page 67

```
 1           DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        DOMINGINHO POWELL
```

Page 68

```
 1           DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        DOMINGINHO POWELL
```



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com